**UNITED STATES, Plaintiff,**

**v.**

**Sewn NEWTON, Defendant.**

**No. CRIM.A. 01–CR–126 DGT.**

United States District Court, E.D. New York.

Jan. 3, 2002.

Alan Vinegrad, U.S. Atty., Brooklyn, NY, for U.S.

Susan Kellman, New York City, for Defendant.

## MEMORANDUM AND ORDER

TRAGER, District Judge.

Defendant Sewn Newton is charged with possession of a firearm, having previously been convicted of three crimes each punishable by imprisonment for a term exceeding one year and each a violent felony or serious drug offense. 18 U.S.C. § 922(g)(1), § 924(e)(1), and § 3551 *et seq.* Certain physical evidence, including the firearm in question, was seized from the apartment in which Newton was staying on January 9, 2001. Newton also made several statements to parole officers at the time. Newton now moves to suppress the evidence, arguing that the physical evidence was taken in violation his Fourth Amendment rights, and that the statements were obtained in violation of his Fifth Amendment rights under *Miranda.*

## Background

On July 23–24, 2001, three parole officers with the New York State Division of Parole, Newton, and his mother, Shirley Wright, testified at a suppression hearing. At the conclusion of the hearing, I credited the accounts of the parole officers. Therefore, I make the following findings of fact.

At the times relevant to this case, Newton was on parole under the supervision of the New York State Division of Parole. Tr. of Suppression Hr'g, July 23–24, 2001 ("Tr.") at 21. When he was released on parole on March 6, 2000, Newton signed a standard certificate of release in which he agreed that during his period of supervision, he "will permit his parole officer to visit him at his residence and/or place of employment and will permit the search and inspection of his person, residence and property." Tr. at 21–22. Since his release, Newton has occasionally stayed as an overnight guest at his mother's apartment. Tr. at 53.

On January 8, 2001, Carole Flot, a senior parole officer, received a phone call from a social worker at a victims' services organization. Tr. at 9. The social worker told Flot that she had received a call from Newton's mother. Tr. at 11. In her call to the social worker, Wright said that Newton threatened to kill her and her husband, and that he kept a gun in a box by the door of her home. Tr. at 9. The social worker added that she had not been able to provide services to Wright and her husband. *Id.*

Flot conveyed this information to John Zwaryczuk, a parole officer working that day. *Id.* Zwaryczuk then contacted Newton's parole officer, Barry Davis, and Davis' partner, John White, and informed them of the allegations against Newton. Tr. at 23. Davis told his superior, John Contino, about the allegations, and Contino

advised him to conduct a "safety search." Tr. at 69. Davis, White, and Zwaryczuk decided to visit Newton at his mother's apartment the next morning. Tr. at 24. They also contacted the local police precinct and invited a police sergeant and two officers to accompany them. *Id.* None of the parole officers contacted the social worker to discuss the allegations. Tr. at 34.

Early in the morning of January 9, 2001, the three parole officers and three police officers arrived at Wright's apartment. Tr. at 25–26. After Davis knocked for several minutes, Newton opened the door dressed only in his underwear. Tr. at 26, 49, 63. Davis asked Newton to step into the hallway and turn around. Tr. at 63. Davis then handcuffed Newton, and told him that he was not under arrest and that the handcuffs were for the safety of both the officers and Newton. Tr. at 50, 63.

Newton was taken back into the apartment, and sat by the officers in a chair in the foyer just inside the door. Tr. at 26. Davis asked Newton where his mother was, and Newton replied she was in the back. Tr. at 76. Zwaryczuk then began to question Newton, asking him if he had any kind of contraband in the home. Tr. at 26–27. Newton looked at a closed shoe box on a table behind Zwaryczuk, motioned with his head and body toward the table, and said, "only what is in the box." Tr. at 27, 63. Zwaryczuk asked Newton what was in the box, and Newton replied, "a two and two." Tr. at 27. Zwaryczuk then asked Newton, "What is a two and two?" and received no answer. *Id.* Zwaryczuk opened the box and found an unloaded .22 caliber automatic firearm, a fully loaded magazine, and several loose rounds.

*Id.* Zwaryczuk opened the box "maybe under a minute" after the officers entered the apartment. *Id.*

According to Zwaryczuk, when the gun was found, Newton's parole was revoked automatically and he became under arrest. Tr. at 29. Newton was then handed over to one of the police officers to be processed. Tr. at 29. At the apartment, Zwaryczuk gave the box and its contents to White, who gave it to the police sergeant. Tr. at 45. At no time during Newton's questioning or arrest at the apartment did any of the parole or police officers read Newton his *Miranda* rights. Tr. at 38.

While Zwaryczuk questioned Newton, Davis went to the bedroom in the back of the apartment, where he encountered Wright coming out of a bedroom.[1] Tr. at 76. Wright's husband was also present. Tr. at 70. Davis asked Wright and her husband if they were all right, then explained why the officers were there and asked her permission to search the apartment. Tr. at 28, 66. This request occurred after Zwaryczuk had found the firearm in the shoe box. Tr. at 40. Wright verbally agreed, and some of the officers searched the living room where Newton slept. Tr. at 28, 39, 66. No other firearms were found. Tr. at 29.

Newton's girlfriend was also present in the apartment when the officers arrived and searched. Tr. at 61.

## Discussion

Newton seeks to suppress the physical evidence seized by officers, and all statements he made in response to the parole officers' questions. Each issue will be addressed separately.

---

**1.** The testimony is unclear on whether any of the other officers went with Davis to the back of the apartment. Davis stated that the other officers were "just standing there" near Newton, Tr. at 76, while Zwaryczuk stated that "the rest of the team went in the back." Tr. at 28.

**(1)**

Newton seeks to suppress the evidence seized by the officers, claiming that the search violated his Fourth Amendment right to be secure from unreasonable searches and seizures.

The government initially argues that the parole officers were present in Wright's apartment pursuant to their inherent authority to conduct home visits of parolees. "To be sure, 'home visits' by parole officers are among the lawful restrictions to which parolees have traditionally been subjected." *United States v. Trzaska,* 866 F.Supp. 98, 101–02 (E.D.N.Y.1994) (citing *Diaz v. Ward,* 506 F.Supp. 226, 228–29 (S.D.N.Y.1980)). By signing the certificate of release, Newton agreed to allow his parole officer to visit him at home.

■ Newton argues that the parole officers engaged in a search of the apartment, not a home visit. A home visit is not a search, even though a visit may result in seizure of contraband in plain view. *See Trzaska,* 866 F.Supp. at 102. There is a "common sense" distinction between visits and searches: searches are "an intrusive, probing endeavor," while home visits are "much more restricted in scope." *Diaz,* 506 F.Supp. at 228. Furthermore, in *Trzaska,* the stated purpose of the routine home visit was to verify the parolee's residence, employment status, and other indicia of community status.

The parole officers here did not undertake a restricted visit of Newton. They instead handcuffed Newton, entered the apartment, and looked for the gun. This "intrusive, probing endeavor" must be characterized as a search, not a home visit. The question, therefore, is whether the search was lawful under the Fourth Amendment.

■ A parolee or a probationer does not generally surrender his Fourth Amendment right to be secure from unreasonable searches and seizures. *See Griffin v. Wisconsin,* 483 U.S. 868, 873, 107 S.Ct. 3164, 3168, 97 L.Ed.2d 709 (1987) (probationer's home protected by Fourth Amendment); *United States v. Grimes,* 225 F.3d 254, 258 (2d Cir.2000) (applying *Griffin* to parolees). Moreover, as the district court in *Grimes* noted, a parolee's status is relevant to the evaluation of what is a reasonable search. *See United States v. Grimes,* 67 F.Supp.2d 170, 175 (W.D.N.Y.1999). That is, a search that is unreasonable with respect to an individual not on parole may be reasonable with respect to an individual who is. *See id.*

In most situations, a search may only be undertaken pursuant to a warrant supported by probable cause. *See Griffin,* 483 U.S. at 873, 107 S.Ct. at 3168. However, the Supreme Court has permitted exceptions when "special needs" beyond the normal need for law enforcement make the warrant and probable cause requirement impractical. *Id.* One of these exceptions is for a state's operation of its probation or parole system. *See id.* (probation system); *Grimes,* 225 F.3d at 258 (applying *Griffin* to parole system). "As a result, probationers [and parolees] may be subject to 'a degree of impingement upon privacy that would not be constitutional if applied to the public at large.'" *Id.* (quoting *Griffin,* 483 U.S. at 875, 107 S.Ct. at 3169).

■ To guarantee a parolee's somewhat diminished Fourth Amendment rights, these impingements must occur "pursuant to a regulation that itself satisfies the Fourth Amendment's reasonableness requirement." *Griffin,* 483 U.S. at 873, 107 S.Ct. at 3168. This formulation is an extension of the doctrine regarding warrantless administrative searches, in which "government investigators conducting searches pursuant to a regulatory scheme need not adhere to the usual warrant or

probable-cause requirements as long as their searches meet 'reasonable legislative or administrative standards.' " *Id.* (quoting *Camara v. Municipal Court*, 387 U.S. 523, 538, 87 S.Ct. 1727, 1736, 18 L.Ed.2d 930 (1967)).

■ Applying this standard to the case at bar therefore requires a determination of whether the regulations under which Newton's mother's apartment was searched satisfy the Fourth Amendment's reasonableness requirement, and whether that search was conducted pursuant to those regulations.

This seemingly straightforward analysis is complicated by a preliminary question: what are the applicable "regulations"? As Newton was a parolee with the New York State Division of Parole, state law must provide the appropriate search regulations.[2] There are three possibilities.

First, the search may have been conducted pursuant to the New York State Division of Parole's Policy and Procedures Manual ("Manual"). *See* July 23, 2001 Hr'g Ex. B. Item 9405.04 of the Manual provides guidelines for home visits, searches, and seizures of parolees by parole officers. *See id.* Section II of Item 9405.04 specifically provides guidelines for warrantless searches of parolees. *See id.* Under Section II.A:

A parole officer may search a releasee for evidence of a crime or evidence of a violation of any of the releasee's conditions of parole where the officer has an articulable reason for conducting the search that is reasonably related to the circumstances of the particular case and rationally related to the officer's duty to supervise the releasee.

*Id.* Moreover, under Section II.B.4 ("Specific applications ... Search of a residence"), "a releasee's residence may be searched only where the officer has an articulable reason for conducting the search and then only with the consent of the releasee, or the consent of another adult member of the household." *Id.* The Manual also contains specific guidelines regarding home visits, and paperwork and filing requirements relating to consent and seizures. Newton assumes that the Manual is the applicable regulation, and bases his argument on the parole officers' alleged violations of the Manual's guidelines.

Second, the search may have been conducted pursuant to regulations governing release conditions of parolees. New York State Division of Parole regulations mandate that "[a] copy of the conditions of release, with the addition of any special conditions, shall be given to each inmate upon his release to supervision." N.Y. Comp.Codes R. & Regs. 9 § 8003.2 (1995).[3]

---

**2.** Using "regulations" derived from state law distinguishes the case at bar from *Trzaska.* In *Trzaska,* the parolee was under the supervision of the United States Probation Department for the Eastern District of New York. *Id.* at 100. There was no federal statute or regulation that authorized the search of the parolee's residence. *See id.* at 104. Nor did the conditions of release in the certificate of parole permit general searches of the parolee's residence. Rather, the Parole Commission regulations only permitted confiscation of contraband observed in plain view by a probation officer during a routine supervisory visit. *See id.* The district court further noted that the Parole Commission did not impose on Trzaska the condition, authorized by its regulations, that would have required him to permit probation officers to search his apartment. *See id.* Accordingly, the court held that the unconsented entry into and search of the parolee's apartment was not conducted pursuant to a valid regulation, and suppressed the evidence seized. *Trzaska* is therefore inapposite on its face because it involved federal, not state, regulations, and because the certificate of release clearly did not authorize searches of the parolee's residence.

**3.** These regulations were promulgated through the Division of Parole's authority under N.Y. Exec. Law § 259(2) (McKinney's

The regulations further state that the conditions of release are to include: "[a] releasee will permit his parole officer to visit him at his residence and/or place of employment and will permit the search and inspection of his person, residence and property." N.Y. Comp.Codes R. & Regs. 9 § 8003.2(d). The government claims that the Division of Parole is governed by these regulations.

Finally, the search may have been conducted pursuant to case law developed by New York courts regarding warrantless searches of parolees. In *People v. Huntley*, 43 N.Y.2d 175, 401 N.Y.S.2d 31, 371 N.E.2d 794 (1977), a parolee who had upon release signed a standard certificate of release authorizing searches failed to report to two meetings with his parole officer, lied about his employment status, and received welfare benefits without asking permission. *See id.* at 179–80, 401 N.Y.S.2d 31, 371 N.E.2d 794. Armed with a parole violation warrant but not a search warrant, parole officers searched the defendant's residence and found bullets, heroin, and cocaine.

The Court of Appeals held that the standard authorization "is not to be taken as an unrestricted consent to any and all searches or as a blanket waiver of all constitutional rights to be secure from unreasonable searches and seizures." *Id.* at 182, 401 N.Y.S.2d 31, 371 N.E.2d 794. Nevertheless, the court refused to suppress the evidence, asserting that "whether the action was unreasonable and thus prohibited by constitutional proscription must turn on whether the conduct of the parole officer was rationally and reasonably related to the performance of the parole officer's duty." *Id.* at 181, 401

N.Y.S.2d 31, 371. N.E.2d 794. Based on the parolee's demonstrated unreliability, the court applied this standard and held the search to be reasonably and rationally related to the parole officer's duty to detect and prevent parole violations. *See id.* at 181–82, 401 N.Y.S.2d 31, 371 N.E.2d 794. The government cites *Huntley* for the proposition that warrantless searches of parolees are valid if they are rationally and reasonably related to the performance of the parole officer's duty.

There are significant differences between the three potentially relevant "regulations." *Huntley* merely requires that the search be rationally and reasonably related to the performance of the parole officer's duty. No consent of the parolee or other inhabitant of the residence is required. The Manual requires both consent and an articulable reason for conducting the search. The release conditions regulations on their face appear to require nothing more than the signature of the parolee on the standard certificate of release. They do not specifically contain a reasonableness standard.[4]

It may seem counterintuitive to regard case law such as *Huntley* as a "regulation" pursuant to which a search was conducted, but that was the precise holding of the Second Circuit in *Grimes*. There, a parolee tested positive for drugs, failed to comply with conditions of his drug treatment program, failed to attend a required education program, and lied to his parole officer about his contact with police. *Grimes*, 225 F.3d at 256. When the parole officer learned of Grimes' dishonesty regarding a run-in with police, the officer obtained a parole violation warrant from her superior

2001) ("The chairman shall promulgate such regulations as are necessary and proper for the efficient operation of the division.").

4. However, see the discussion below of the implied requirement that the searches to which the parolee consented be based on at least reasonable suspicion.

and went to Grimes' residence with five other parole officers. When the officers arrived, Grimes' sister locked the door to the house, told the officers that Grimes would soon come out (but that they would not be allowed inside), and threatened to set a Rottweiler on them if they tried to enter. Over the next few minutes, the officers heard people walking around upstairs, loud thumping, and loud music. When Grimes finally emerged, he tried to squeeze out the front door and prevent the officers from entering. The officers, concerned there could be someone inside with a gun, briefly forced the door open. While Grimes was being arrested, Grimes' sister slammed the door shut. Eventually, the police arrived and arrested Grimes' sister for obstructing governmental administration. The parole officers searched Grimes' bedroom, and found evidence of crimes. Grimes' sister refused to give the parole officers permission to search the entire house, but Grimes' mother, the "main renter" of the house, did consent to a search when she returned. In the search, the police found additional evidence of crimes. At trial, Grimes moved to suppress the evidence seized.

Assessing "New York's search regulations for parolees 'as [they have] been interpreted by state corrections officials and state courts,'" the court turned to *Huntley. See Grimes*, 225 F.3d at 258 (quoting *Griffin*, 483 U.S. at 875, 107 S.Ct. at 3169). It first held that "the special needs attendant to the operation of New York's parole system" justified the departure from traditional Fourth Amendment principles. *Id.* The court then quoted the standard articulated in *Huntley*, and found that there was "no evidence that 'New York State's rules specified in *Huntley*, or

the searches conducted in this case, are inconsistent with the Fourth Amendment.'" *Id.* (quotation unattributed).

In a footnote, the court rejected the defendant's argument that the search was not done pursuant to any state regulation. *See id.* at 258 n. 3. Instead, the court observed that the *Griffin* opinion did not draw a distinction between "legislatively- and judicially-crafted rules." *Id.* (citing *United States v. Giannetta*, 909 F.2d 571, 575 (1st Cir.1990)). The court added that it could "see no reason to distinguish" between legislative and judicial rules for these purposes. *Id.* The critical question, the court concluded, is whether the regulation contains a reasonableness requirement, not which branch of government generated the rule. *See id.* This view is supported to a degree by post-*Griffin* decisions in which intermediate-level New York appellate courts looked only to *Huntley* when parolees challenged warrantless searches, and did not mention the Manual or standard consent forms. *See People v. Brown*, 276 A.D.2d 635, 714 N.Y.S.2d 887 (2d Dep't 2000); *People v. Nelson*, 257 A.D.2d 765, 683 N.Y.S.2d 656 (3d Dep't 1999).[5]

Following *Grimes* application of the *Huntley* "regulation," the search of Wright's apartment therefore was lawful if it was rationally and reasonably related to the performance of the parole officer's duty. Included in that duty is the obligation to detect and prevent parole violations so as to protect the public from the commission of further crimes. *See Huntley*, 43 N.Y.2d at 181, 401 N.Y.S.2d at 34, 371 N.E.2d 794. The parole officers received information from Wright's social worker that Newton had threatened Wright and her husband, and that he was

---

**5.** However, both cases have limited factual discussions and neither mentioned *Griffin* at all, leaving open the possibility that neither of the other potential regulations was considered.

keeping a gun in the house. Searching Wright's apartment based on this information clearly was rationally and reasonably related to the parole officers' duty to detect the possession of a firearm in violation of Newton's parole and to protect Wright and her husband. The evidence seized during the search therefore should not be suppressed under this analysis.

However, despite the unmistakable holding in *Grimes,* there is some reason to question the result. Most importantly, the court did not have an opportunity to consider the Manual. The district court, which also used *Huntley* as the relevant regulation, specifically noted that the Manual was not introduced into evidence and thus did not consider it in making its decision. *See Grimes,* 67 F.Supp.2d at 176 n. 4. The district court also stated inaccurately that *Huntley* was incorporated into the Manual's Section II.A. *Id.* Unlike the Manual, *Huntley* does not require the consent of the parolee or of another adult member of the household.

In addition, the case relied on by the Second Circuit for the proposition that there is no difference between "legislatively-and judicially-crafted rules" is not precisely on point. *United States v. Giannetta* involved a condition of probation narrowly tailored by a judge to the circumstances of an individual case after careful consideration, not a general rule governing searches promulgated by a court. *See Giannetta,* 909 F.2d at 575. The court there concluded that the guidance and constraints of such a narrowly tailored condition are comparable to a legislative or administrative regulatory framework. *Id.* The court in *Grimes* did not discuss whether a general judicial rule offers the same degree of guidance and constraints. On the other hand, it is not clear that federalism permits federal courts to question whether otherwise constitutional search and seizure rules become improper because they are developed by the courts rather than adopted by the legislature. State separation of powers issues do not generally raise constitutional questions.

Accordingly, it is appropriate to consider whether the evidence seized in the search of Wright's apartment should be suppressed under either of the other potentially applicable regulations. Newton argues that the Manual is the relevant regulation, and that no consent was given to search the apartment. Newton also asserts that the certificate of release form he signed does not give parole officers "carte blanche" to search his residence at any time. Instead, he claims that the officers needed contemporaneous consent to search. According to Newton, the significance of the certificate of release is that if the parolee refuses to grant parole officers permission to search his residence, the only consequence is that the parolee's parole should be revoked.

Newton correctly observes that the New York Court of Appeals held in *Huntley* that the standard authorization to search a parolee's residence included in the certificate of release "is not to be taken as an unrestricted consent to any and all searches or as a blanket waiver of all constitutional rights to be secure from unreasonable searches and seizures." *Huntley,* 43 N.Y.2d at 182, 401 N.Y.S.2d at 35, 371 N.E.2d 794. However, this statement does not render the consent given by the certificate of release entirely inoperative. Rather, New York courts have strongly implied that the standard certificate of release means that the parole officers do not need further consent to conduct searches that are reasonably and rationally related to their duty. *See id.* at 182–183, 401 N.Y.S.2d at 35, 371 N.E.2d 794 (the authorization "merely parallels, by way of con-

firmation, the right [of the parole officer] to conduct searches that are rationally and substantially related to the performance of his duty"); *see also People v. Mackie*, 77 A.D.2d 778, 779, 430 N.Y.S.2d 733, 735 (4th Dep't 1980) ("The authorization is not an unrestricted consent to any and all searches and does not obviate a showing by the parole officer that the search was rationally related to his duty to detect and prevent parole violations.").

This view is strongly supported by courts outside of New York that have carefully considered the issue. Most of these courts have held that the consent to search signed by a parolee upon his release allows parole officers to perform searches based on reasonable suspicion. *See Cherry v. State*, 302 Ark. 462, 466–67, 791 S.W.2d 354, 356–57 (1990) (signed consent valid because it contains elements that insure a search will be reasonable); *Commonwealth v. Williams*, 547 Pa. 577, 588–89, 692 A.2d 1031, 1036–37 (1997) ("the parolee's signature acts as acknowledgment that the parole officer has a right to conduct reasonable searches of his residence listed on the parole agreement without a warrant"); *Pena v. State*, 792 P.2d 1352, 1357 (Wyo.1990) (despite signed consent to search at any time, parolee still entitled to Fourth Amendment mandate that the search be reasonable); *see also People v. Reyes*, 19 Cal.4th 743, 760–61, 80 Cal. Rptr.2d 734, 968 P.2d 445, 455–56 (1998) (listing additional state cases, statutes, and administrative regulations) (concurring and dissenting opinion).[6]

In addition, the Supreme Court recently agreed with the reasoning of these cases, albeit in the context of a signed consent form imposed as a condition of probation. In *United States v. Knights*, —— U.S. ——, 122 S.Ct. 587, —— L.Ed.2d —— (2001), the defendant signed a probation order that included the condition that he would "[s]ubmit his ... person, property, place of residence, vehicle, personal effects, to search at any time, with or without a search warrant, warrant of arrest, or reasonable cause by any probation officer or law enforcement officer." *Id.* at ——, 122 S.Ct. at 588. The Court held that by agreeing to the condition, the defendant's reasonable expectation of privacy was significantly diminished. *Id.* at ——, 122 S.Ct. at 591. Therefore, the balance between his privacy interests and the government's interests in rehabilitation and protecting society from future criminal violations required "no more than reasonable suspicion to conduct a search of this probationer's house." *Id.* at ——, 122 S.Ct. at 592. In short, the Court concluded that the police only need to have reasonable suspicion to search a probationer's residence or property if the probationer previously consented to searches upon release. While the circumstances in *Knights* are not precisely analogous to those involving Newton, the analysis of the aforementioned cases comports with the principle articulated by the Supreme Court.

Newton's contention that a parolee's certificate of release does not authorize a search of the parolee's residence, but is instead a kind of contract under which a parolee's failure to contemporaneously consent to a search results only in a parole violation, has no merit and virtually no applicable support. As one New York

---

**6.** Indeed, the only other view identified by independent research is that a standard consent form that does not explicitly require the search to be reasonable (like the one signed by Newton) allows parole officers to search the parolee's residence even in the absence of particularized reasonable suspicion. *See Reyes*, 19 Cal.4th at 753, 80 Cal.Rptr.2d 734, 968 P.2d at 451; *State v. Zeta Chi Fraternity*, 142 N.H. 16, 696 A.2d 530, 540–41 (1997). This perspective is obviously of no aid to Newton.

court held, a parolee's signed certificate of release "expressly consents to a search of his person or residence as a condition of his parole." *State ex rel. McNeil v. New York State Bd. of Parole*, 87 Misc.2d 497, 501, 385 N.Y.S.2d 731 (N.Y.Sup.Ct.1976). In support of Newton's position, a handful of intermediate-level appellate courts in Oregon have held that a probationer's refusal to submit to a search under the terms of his probation does not give the probation officer the authority to conduct a warrantless search. *See State v. Davis*, 133 Or.App. 467, 473, 891 P.2d 1373, 1378 (1995); *State v. Hindman*, 125 Or.App. 434, 866 P.2d 481, 482 (1993). But "Oregon stands alone in their interpretation." *State v. James*, 963 P.2d 1080, 1083 (Alaska Ct.App.1998) (citing cases from other jurisdictions). Nor does language in *Trzaska* support Newton's assertion. There, federal probation officers searched a parolee's residence without a warrant or his contemporaneous consent. *Trzaska*, 866 F.Supp. at 101. The court observed that "[w]hile the refusal of the parolee to consent may constitute grounds for violation of his parole, the Probation Officers lacked the 'seizure power' of other law enforcement officers." *Id.* at 104 (quoting *Wilson v. U.S.*, 959 F.2d 12, 15 (2d Cir. 1992)). However, *Trzaska* is inapposite because the parolee did not consent to searches upon his release, as Newton did. *Trzaska*, 866 F.Supp. at 104.

The search of Newton's mother's apartment was therefore valid under either the Manual or the release conditions regulations if Newton signed the certificate of release and the search was based on rea-

sonable suspicion. Newton did sign the certificate of release, and, as discussed above, the social worker's report that Newton threatened his mother and stepfather and kept a gun in the apartment gave the parole officers reasonable suspicion that Newton was violating the terms of his parole. Therefore, applying either the Manual or the release conditions regulations, the search of the apartment was pursuant to a regulation that satisfied the Fourth Amendment's reasonableness requirement, and the evidence should not be suppressed.

In conclusion, the search was valid under any of the three potential "regulations" and the evidence gathered during the search thus will not be suppressed.[7]

### (2)

Newton also seeks to suppress statements he made in response to the officers' questions in the absence of *Miranda* warnings.

■ The Fifth Amendment provides that "no person ... shall be compelled in any criminal case to be a witness against himself." It is well settled that if the police take a suspect into custody and then ask him questions without informing him of his familiar *Miranda* rights, his responses cannot be introduced into evidence to establish his guilt. *See Dickerson v. United States*, 530 U.S. 428, 431–32, 120 S.Ct. 2326, 2329–30, 147 L.Ed.2d 405 (2000) (upholding *Miranda* ); *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694 (1966); *United States v. Mitchell*, 966 F.2d 92, 97–98 (2d Cir. 1992). Newton argues that the parole offi-

---

7. Resolution of the question on these grounds makes it unnecessary to reach the issue of whether the seizure was valid under the "inevitable discovery" doctrine. *See Nix v. Williams*, 467 U.S. 431, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984); *United States v. Eng*, 971 F.2d 854 (2d Cir.1992). Since it appears that

Newton's mother voluntarily consented to a search of the apartment within moments of the seizure, it is more than likely that the gun inevitably would have been discovered even if the parole officers' search was otherwise invalid.

cers placed him in custody and then interrogated him without informing him of his *Miranda* rights. Therefore, Newton claims that any statements he made during the interrogation must be suppressed.

### a. Custody

The first question that must be answered is whether Newton was is custody for the purposes of *Miranda* when Officer Zwaryczuk questioned him. If Newton was not in custody, any statements he made are admissible even if he was not given the *Miranda* warnings.

At its core, *Miranda* seeks to deal with those situations in which a person suspected or accused of a crime might feel compelled by police to incriminate himself. *See Miranda*, 384 U.S. at 467, 86 S.Ct. at 1624. A suspect placed in the "coercive environment," *Oregon v. Mathiason*, 429 U.S. 492, 495, 97 S.Ct. 711, 714, 50 L.Ed.2d 714 (1977), of custodial interrogation faces "compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely." *Miranda*, 384 U.S. at 467, 86 S.Ct. at 1624. Moreover, these pressures may lead the subject of the questioning to believe "that he has no choice but to submit to the officer's will and to confess." *Minnesota v. Murphy*, 465 U.S. 420, 433, 104 S.Ct. 1136, 1145, 79 L.Ed.2d 409 (1984). "The coercion inherent in custodial interrogation derives in large measure from an interrogator's insinuations that the interrogation will continue until a confession is obtained." *Id.* at 433, 104 S.Ct. at 1145.

These concerns led the Court in *Miranda* to define "custodial interrogation" as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda*, 384 U.S. at 444, 86 S.Ct.

at 1612. The Court subsequently explained that "the ultimate inquiry is simply whether there is a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." *California v. Beheler*, 463 U.S. 1121, 1125, 103 S.Ct. 3517, 3520, 77 L.Ed.2d 1275 (1983) (quoting *Mathiason*, 429 U.S. at 495, 97 S.Ct. at 714). This test is based on the objective circumstances of the interrogation, not on the subjective views of either the interrogating officers or the person being questioned. *See Stansbury v. California*, 511 U.S. 318, 322, 114 S.Ct. 1526, 1529, 128 L.Ed.2d 293 (1994).

■ Applying these principles, the Second Circuit has established two somewhat different formulations to determine if a person is in custody. Most recently, it stated that:

> the test used in determining whether a defendant was in custody is an objective one that (a) asks whether a reasonable person would have understood herself to be subjected to restraints comparable to those associated with a formal arrest, and (b) focuses upon the presence or absence of affirmative indications that the defendant was not free to leave. An accused is in custody when, even in the absence of an actual arrest, law enforcement officials act or speak in a manner that conveys the message that they would not permit the accused to leave.

*Tankleff v. Senkowski*, 135 F.3d 235, 243–44 (2d Cir.1998); *see also United States v. Kirsh*, 54 F.3d 1062, 1067 (2d Cir.1995) (internal quotations omitted); *Mitchell*, 966 F.2d at 98; *Campaneria v. Reid*, 891 F.2d 1014, 1021 n. 1 (2d Cir.1989). An earlier description of the test focused on whether the "questioning was conducted in custodial settings that have inherently coercive pressures that tend to undermine the individual's will to resist and to compel him to speak." *United States v. Morales*,

834 F.2d 35, 38 (2d Cir.1987). Although this formulation was dictum, Second Circuit courts continue to cite it as well. *See Tankleff v. Senkowski*, 135 F.3d at 244; *Kirsh*, 54 F.3d at 1067; *Mitchell*, 966 F.2d at 98.

I believe that the *Morales* formulation adheres more closely to *Miranda*'s central concern that the police will use coercive environments and psychological tactics to compel subjects of questioning to confess.[8] The language in *Senkowski* that focuses on the presence of indications that the defendant was not free to leave is over-inclusive. There are many situations in which there are powerful indications that the suspect was not free to leave in which coercive pressures to confess are absent. *See, e.g., Berkemer v. McCarty*, 468 U.S. 420, 436, 104 S.Ct. 3138, 3148, 82 L.Ed.2d 317 (1984) ("Certainly few motorists would feel free . . . to leave the scene of a traffic stop without being told they might do so."); *see also Cruz v. Miller*, 255 F.3d 77, 85 (2d Cir.2001) (noting tension between the "free to leave" standard and fact that the subject of questioning does not feel free to leave in all investigatory stops by police). Indeed, even a fully law-abiding citizen would not feel free to leave during nearly all interactions with the police. As the New York Court of Appeals observed:

> There are, it is true, few people who would feel free to walk away from a police officer who stopped to question them. Some, hopefully most, would feel restrained out of respect for an office of the law who is, after all, their servant and protector. Others, unfortunately, would feel restrained by fear of a police officer.

*People v. P.*, 21 N.Y.2d at 11, 286 N.Y.S.2d at 234, 233 N.E.2d 255. In my view, the *Morales* formulation is the appropriate approach to determine whether a person is in custody for *Miranda* purposes.

The classic coercive environment of a custodial setting in which there are inherently coercive pressures that tend to undermine the individual's will to resist and to compel him to speak is the station-house interrogation at issue in *Miranda* itself. *See Miranda*, 384 U.S. at 456–57, 86 S.Ct. at 1618. The Court also noted that its decision was not intended to apply to "[g]eneral on-the-scene questioning as to the facts surrounding a crime or other general questioning of citizens in the fact-finding process." *Id.* at 477, 86 S.Ct. at 1629; *see also Beckwith v. United States*, 425 U.S. 341, 96 S.Ct. 1612, 48 L.Ed.2d 1 (1976) (no custody when defendant interviewed at home by IRS agents); *Mitchell*, 966 F.2d at 99 (no custody when defendant interviewed at home by EPA agents). Despite this language, courts have found suspects to be in custody in settings outside of the police station. *See, e.g., Orozco v. Texas*, 394 U.S. 324, 89 S.Ct. 1095, 22 L.Ed.2d 311 (1969) (custody when defendant in his bedroom surrounded by four police officers at 4 a.m.); *New York v. Quarles*, 467 U.S. 649, 104 S.Ct. 2626, 81 L.Ed.2d 550 (1984) (custody when defendant in supermarket handcuffed and surrounded by police officers).

However, the Supreme Court found there was no custody in one setting outside of the station-house with particular relevance to this case—when a police officer questioned an individual during a traffic

---

**8.** The New York Court of Appeals has taken a similar view of *Miranda*. In *People v. P.*, 21 N.Y.2d 1, 286 N.Y.S.2d 225, 233 N.E.2d 255 (1967) (Keating, J.), the court held that "the Supreme Court intended that the warnings be given when the questioning takes place under circumstances which are likely to affect substantially the individual's 'will to resist and compel him to speak where he would not otherwise do so freely.'" *Id.* at 11, 286 N.Y.S.2d at 234, 233 N.E.2d 255 (quoting *Miranda* ).

stop. *See Berkemer,* 468 U.S. at 439–440, 104 S.Ct. at 3150; *see also Pennsylvania v. Bruder,* 488 U.S. 9, 109 S.Ct. 205, 102 L.Ed.2d 172 (1988) (reaffirming *Berkemer* ). In *Berkemer,* a police officer pulled over Berkemer after observing his car weaving in and out lanes. *See id.* at 423, 104 S.Ct. at 3141. Without having administered the *Miranda* warnings, the officer asked Berkemer if he had been using intoxicants. Berkemer responded that he had consumed alcohol and smoked marijuana a short time before. At trial, Berkemer sought to suppress his statements on the grounds that they were made while he was in custody without the *Miranda* warnings.

The Court held that an ordinary traffic stop does not result in custody for the purposes of *Miranda,* analogizing the custody aspects of a traffic stop to the Fourth Amendment seizure aspects of a stop under *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). *See id.* at 439–440, 104 S.Ct. at 3150. Under *Terry,* a police officer who lacks probable cause but whose observations lead him to reasonably suspect that a particular person has committed, is committing, or is about to commit a crime may briefly detain that person to investigate the circumstances that provoked the suspicion, and this detention does not subject that person to an unreasonable seizure under the Fourth

Amendment. *See id.* (quoting *United States v. Brignoni–Ponce,* 422 U.S. 873, 881, 95 S.Ct. 2574, 2580, 45 L.Ed.2d 607 (1975)). These stops must be reasonably related in scope to their justification, meaning that the officer may ask the detainee a moderate number of questions regarding his identity and the officer's suspicions, and that the detainee must be released unless his answers provide the officer with probable cause for arrest. *See id.* at 439–40, 104 S.Ct. at 3150. "The comparatively nonthreatening character of detentions of this sort explains the absence of any suggestions in our opinions that *Terry* stops are subject to the dictates of *Miranda.*" *Id.* at 440, 104 S.Ct. at 3150.[9] The rationale of *Berkemer* recently was reviewed in detail by the Second Circuit in *Cruz,* 255 F.3d at 82–84 (concluding that a state court did not unreasonably apply "somewhat uncertain" precedent when it denied a writ of habeas corpus for a defendant who was followed by police, stopped after getting off a subway, then questioned about a murder without having been administered the *Miranda* warnings).

To be sure, the Supreme Court did not adopt a bright-line rule that *Miranda* warnings are never required during *Terry* stops. It held that "a motorist who has been detained pursuant to a traffic stop thereafter is subjected to treatment that

**9.** The Court also observed that while traffic stops significantly curtail the freedom of action of the occupants of the detained vehicle, several features of the stops "mitigate the danger that a person questioned will be induced 'to speak where he would not otherwise do so freely.'" *Id.* at 436–37, 104 S.Ct. at 3148–49 (quoting *Miranda,* 384 U.S. at 467, 86 S.Ct. at 1624). "Perhaps most importantly, the typical traffic stop is public, at least to some degree." *Id.* at 438, 104 S.Ct. at 3149. This public exposure makes it more difficult for "an unscrupulous policeman to use illicit means to elicit self-incriminating statements," and reduces the stopped motorist's fear that

he will be "subjected to abuse" if he does not cooperate. *Id.* In addition, unlike a prolonged station-house interrogation where a "detainee often is aware that questioning will continue until he provides his interrogators the answers they seek," detention of a motorist during a traffic stop is "presumptively temporary and brief" and will end after a few questions. *Id.* at 437–38, 104 S.Ct. at 3149. Also unlike a police-dominated station-house interrogation, a motorist detained during a typical traffic stop feels much less threatened because normally only one or two police officers are present. *See id.* at 438–39, 104 S.Ct. at 3149.

renders him 'in custody' for practical purposes" would be entitled to the *Miranda* warnings. *Id.* at 440, 104 S.Ct. at 3150. Subsequently, courts have often, though not always, held that suspects were not in custody during *Terry* stops. *See United States v. Wong Ching Hing*, 867 F.2d 754, 756 (2d Cir.1989) (no custody during roadside *Terry* stop); *United States v. Bridges*, 2000 WL 1170137, at *8 (S.D.N.Y. Aug. 16, 2000) (same); *United States v. Friedman*, 1996 WL 612456, at *16 (E.D.N.Y. Aug. 13, 1996) (same). *But see United States v. Barber*, 839 F.Supp. 193, 202 (W.D.N.Y. 1993) (custody during roadside *Terry* stop).

■ In addition, officers may use a degree of restraint during a *Terry* stop to neutralize the threat of physical harm without the stop becoming an arrest, although the permissible amount depends on a wide range of factors. *See Oliveira v. Mayer*, 23 F.3d 642, 645–46 (2d Cir.1994) (listing factors); *United States v. Perea*, 986 F.2d 633, 644 (2d Cir.1993). This is because *Terry* stops are in part justified by:

> the need for law enforcement officers to protect themselves and other prospective victims of violence in situations where they may lack probable cause for an arrest. When an officer is justified in believing that the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous to the officer or to others, it would appear to be clearly unreasonable to deny the officer the power to take the necessary measures to determine whether the person is in fact carrying a weapon and to neutralize the threat of physical harm.

*Terry*, 392 U.S. at 24, 88 S.Ct. at 1881; *see also United States v. Alexander*, 907 F.2d 269, 272 (2d Cir.1990) (during a *Terry* stop, a "law enforcement agent, faced with the possibility of danger, has a right to take reasonable steps to protect himself and an obligation to ensure the safety of innocent bystanders, regardless of whether probable cause to arrest exists"). In particular, when police officers have a reasonable basis to believe that the suspect poses a threat, they have been permitted to draw their guns and handcuff a suspect during a *Terry* stop without converting it into an arrest. *See Oliveira*, 23 F.3d at 646 (listing cases); *Perea*, 986 F.3d at 645. Therefore, based on *Berkemer* and its progeny, a person temporarily detained during a *Terry* stop is not necessarily in custody for the purposes of *Miranda*, even if he has been handcuffed or otherwise restrained. *See, e.g., United States v. Prince*, 157 F.Supp.2d 316, 324–25 (D.Del.2001) (no custody for *Miranda* purposes during *Terry* stop where suspect was handcuffed, placed in police car, and told she was not under arrest, but the officers were justified in concern for their safety).

■ Similarly, when the occupants of a premises being searched by the police are detained during the search, they have not been seized for Fourth Amendment purposes during the search. *See Michigan v. Summers*, 452 U.S. 692, 704–05, 101 S.Ct. 2587, 2595, 69 L.Ed.2d 340 (1981) (no unreasonable seizure when defendant was encountered on steps outside his home and held while police executed a search warrant); *Rivera v. United States*, 928 F.2d 592, 606 (2d Cir.1991) ("Absent special circumstances, the police of course have the authority to detain occupants of premises while an authorized search is in progress."). Rather, their detention is analogous to the detention of suspects during *Terry* stops. *Summers*, 452 U.S. at 698 701, 101 S.Ct. at 2592–93; *see also United States v. Jaramillo*, 25 F.3d 1146, 1151–52 (2d Cir.1994) (summarizing cases to mean that *Terry* stops and patdowns are permit-

ted "with respect to persons who own, occupy, or enter upon private premises on which the officers have the right to conduct a search or make a security check."). During execution of a search warrant, detention of the occupants of the premises being searched is justified to: (1) minimize the risk of harm to the officers; (2) prevent flight in the event that incriminating evidence is found; and (3) facilitate the orderly completion of the search. *See Summers*, 452 U.S. at 702-03, 101 S.Ct. at 2594. As with a *Terry* stop, a *Summers*-type detention could become a seizure, in this situation through "special circumstances, or possibly a prolonged detention." *Id.* at 705 n. 21, 101 S.Ct. at 2595. Also similar to *Terry* stops, even holding the detainee at gunpoint or in handcuffs does not necessarily transform a detention during the execution of a search warrant into an unlawful seizure. *See, e.g., United States v. Fountain*, 2 F.3d 656, 666 (6th Cir.1993), *vacated in part on other grounds*, 953 F.Supp. 836 (E.D.Mich.1996) (occupant not unlawfully seized when agents handcuffed him during execution of search warrant on his residence); *Crosby v. Hare*, 932 F.Supp. 490, 493 (W.D.N.Y. 1996) (occupant first held naked and at gunpoint, then placed in handcuffs while dressed during execution of search warrant not unlawfully seized); *Howard v. Schoberle*, 907 F.Supp. 671, 677 (S.D.N.Y. 1995) ("[T]he decision to handcuff Plaintiffs after the police entered the apartment was undeniably lawful.").

In *Summers*, the Court relied in part on the fact that the search was pursuant to a valid warrant issued by neutral magistrate. *Summers*, 452 U.S. at 701-02, 101 S.Ct. at 2593-94. However, the Court explicitly refused to preclude the possibility "that comparable police conduct may be justified by exigent circumstances in the absence of a warrant." *Id.* at 702 n. 17, 101 S.Ct. at 2594. Language in subsequent cases indicates that *Summers* applies to all valid searches, not just those conducted pursuant to a warrant. *See Rivera*, 928 F.2d at 606 (police may detain occupants while an "authorized search" is in progress); *Jaramillo*, 25 F.3d at 1152 (summarizing cases to mean that police may conduct patdowns of people on premises "on which the officers have the right to conduct a search or make a security check.").

Although the Supreme Court has not considered whether people detained during a valid search of a premises are in custody for *Miranda* purposes, the logic of *Berkemer* should apply equally to both *Terry* stops and *Summers*-type detentions. Indeed, at least three circuits have reached this conclusion. For example, in *United States v. Burns*, 37 F.3d 276 (7th Cir.1994), a woman was detained in her hotel room while DEA agents and police officers searched the room pursuant to a warrant. During the search, one of the agents asked Burns several questions without administering the *Miranda* warnings. *Id.* at 277–78. Citing *Terry, Summers,* and *Beheler,* the court held that "a suspect who is detained during the execution of a search warrant has not suffered a restraint on freedom of movement of the degree associated with formal arrest and is thus not in custody for the purposes of *Miranda,*" and refused to exclude the statements. *Id.* at 281 (quotation marks omitted). The court noted that like *Terry* stops, the execution of a search warrant is comparatively non-threatening, often short in duration, and " 'surely less intrusive than the search itself,' " *Id.* (quoting *Summers*, 452 U.S. at 701, 101 S.Ct. at 2593). The court also noted that "detention in a person's own residence or hotel room 'could only add minimally to the public stigma associated with the search itself and would involve neither the inconvenience not the indignity associated with a compelled visit to the

police station.'" *Id.* (quoting *Summers,* 452 U.S. at 702, 101 S.Ct. at 2594). The Fifth and Tenth Circuits have reached similar conclusions. *See United States v. Fike,* 82 F.3d 1315, 1324–26 (5th Cir.1996), *overruled in part on other grounds, United States v. Brown,* 161 F.3d 256, 259 n. 7 (5th Cir.1998); *United States v. Ritchie,* 35 F.3d 1477, 1485 (10th Cir.1994). *But see United States v. Morales,* 611 F.Supp. 242, 244–45 (S.D.N.Y.1985), *rev'd in part on other grounds,* 788 F.2d 883 (2d Cir.1986) (holding defendant in custody and rejecting application of *Summers* and *Berkemer* when police detained him in the premises during a valid search). Using the same rationales, the Seventh Circuit also held that a person held and questioned during a valid but warrantless search was not in custody for *Miranda* purposes. *See United States v. Saadeh,* 61 F.3d 510, 519–20 (7th Cir.1995).[10]

These decisions and *Berkemer* follow from *Miranda*'s core concern that the police will use coercive environments and psychological tactics to compel subjects of questioning to confess, especially in the station-house. Detention during the execution of a search warrant or during a traffic stop does not usually generate such a coercive environment. The detention is normally fairly brief and the questioning usually is also limited in scope and duration. In short, the pressures during the detention are not likely to lead the subject to believe "that he has no choice but to submit to the officer's will and confess." *Minnesota v. Murphy,* 465 U.S. at 433, 104 S.Ct. at 1145.

■■■ Applying these principles to the situation at bar, Officer Zwaryczuk's questioning of Newton was not a custodial interrogation. First, the circumstances of the questioning of Newton fall within the Fifth, Seventh, and Tenth Circuit precedents that found no custody when law enforcement officers detained an occupant of the residence during a valid search. As discussed above, the parole officers here arrived to conduct a valid search under *Griffin* and *Grimes.* As in *Summers,* the officers understandably restrained Newton to protect themselves, prevent flight, and facilitate the search. Nor did putting Newton in handcuffs transform his detention to an unreasonable seizure. Following *Burns, Saadeh, Fike,* and *Ritchie,* Newton was not in custody for *Miranda* purposes while the officers conducted the search. Accordingly, his statements in response to Zwaryczuk's questions should not be suppressed even though he had not been read his *Miranda* rights.

Moreover, the core concerns of *Miranda* were not implicated in Officer Zwaryczuk's questioning of Newton. While there were indications that Newton was not free to leave, a reasonable person in his position also would not have felt placed in a coercive environment in which he has no choice but to submit to the parole officer's will and confess. This conclusion is supported by an analysis of the factors courts have used to determine whether an individual was in custody. *See Tankleff v. Senkowski,* 135 F.3d at 243 (in determining whether a suspect was in custody, courts "look at all the circumstances surrounding the interrogation").

First, Newton was at home, not in the station-house. As discussed above, the court in *Miranda* noted that its decision was not intended to apply to general on-the-scene questioning. *See Miranda,* 384 U.S. at 456–57, 86 S.Ct. at 1618. More-

---

**10.** In all of these cases, the subject of the questioning was not handcuffed. However, the aforementioned cases regarding *Terry* stops and *Summers*—type detentions imply that such a degree of restraint does not necessarily render the suspect in custody.

over, "courts are much less likely to find the circumstances custodial when the interrogation occurs in familiar or at least neutral surroundings." 2 Wayne R. La-Fave and Jerold H. Israel, *Criminal Procedure* § 6.6(e), at 532 (3d ed.1999). Accordingly, *Miranda* rarely applies to an interrogation at a suspect's home. "Lower courts ... almost universally hold that questioning in a suspect's home is not custodial because individuals in a familiar environment are less likely to be intimidated by law enforcement officers." *United States v. Rakowski*, 714 F.Supp. 1324, 1334 (D.Vt.1987); *see also Mitchell*, 966 F.2d at 99 (no custody when a suspect was interviewed at his home by EPA agents). In a familiar environment such as his own home, a suspects is less likely to be susceptible to many of the psychological ploys discussed in *Miranda*. *See Minnesota v. Murphy*, 465 U.S. at 433, 104 S.Ct. at 1145.

In addition, the parole officers told Newton that he was not under arrest.[11] Courts often consider such statements to be an important factor in determining whether a suspect was in custody. *See United States v. Salvo*, 133 F.3d 943, 951 (6th Cir.1998) (statement by police to suspect that he was not under arrest, was free to leave at any time, and would not be arrested at the end of the interview a significant and important factor in determining that the suspect was not in custody); *United States v. Ocasio*, 1996 WL 727442, at *3–5 (S.D.N.Y. Dec. 17, 1996) (defendant not in custody when repeatedly told he was not under arrest and could leave at any time); *see also Oregon v. Mathiason*, 429 U.S. at 493, 495, 97 S.Ct. at 713, 714 (parolee not in custody when in closed room in station-house with police officer but told he was not under arrest); *Beheler*, 463 U.S. at 1122, 1125, 103 S.Ct. at 3518, 3519 (defendant not in custody when interviewed in station-house but told he was not under arrest). This factor is particularly relevant here. As a parolee, Newton was likely to be aware of his custody status. Being specifically told that he was not under arrest and that he was only being handcuffed for his safety and for the safety of the officers indicated to him that he would not be arrested unless the officers found evidence that he had violated his parole. Otherwise, they would have immediately arrested him or revoked his parole and then looked for the gun. As a consequence, the coercive pressure on Newton to confess was significantly lessened.

These factors are obviously counteracted by the fact that Newton was in handcuffs while being questioned. Being placed in handcuffs clearly is a restraint associated with formal arrest and is often a key in determining if a suspect is in custody. *See, e.g., Kirsh*, 54 F.3d at 1067–68 (absence of handcuffs a factor in determining that the suspect was not in custody); *United States v. Henley*, 984 F.2d 1040, 1042 (9th Cir.1993) (suspect in custody when handcuffed, placed in the back of a police car, and told he was not under arrest); *United States v. Smith*, 3 F.3d 1088, 1098 (7th Cir.1993) (defendant in custody when handcuffed, told to sit in a specific place in the grass by the side of the road, and not told whether he was under arrest). However, this factor alone is not dispositive, especially in situations in which officers have concern for their safety. *See Prince*, 157 F.Supp.2d at 324–25 (no custody when suspect in handcuffs in police car

11. Considering that the phone call from the social worker alone probably did not give the officers probable cause to arrest Newton, I conclude that their assertion that he was not under arrest was not a sham, but made in good faith. That there would have been no arrest if no gun had been found is clear.

because "the use of firearms, handcuffs, and other forceful techniques does not necessarily transform an investigative detention into a full custodial arrest"); *United States v. Pichardo,* 1992 WL 249964, at *1–2, 8 (S.D.N.Y. Sept. 22, 1992) (no custody when suspect in his underwear initially forced to the floor at gunpoint, then questioned a few minutes later); *see also United States v. Cota,* 953 F.2d 753, 756, 758–59 (2d Cir.1992) (no custody when suspect initially placed in handcuffs at gunpoint, then questioned after handcuffs removed and she willingly followed police to the station-house). In addition, as discussed above regarding *Terry* stops and *Summers* type detentions, being in handcuffs or a comparable degree of restraint does not necessarily result in an unreasonable seizure under the Fourth Amendment.

Courts also often consider the number of officers present in determining if the suspect was in custody. *See* 2 LaFave and Israel, *supra,* § 6.6(f), at 539–40. This factor cannot be analyzed here because it is unclear how many officers were around Newton when he was being questioned. There were three parole officers and three police officers in Newton's mother's apartment, but there is contradictory testimony as to whether the officers went with Davis to the back of the apartment or were standing around Newton as Zwaryczuk questioned him.

Looking at all the circumstances, I conclude that Newton was not in custody because the questioning was not conducted in a setting in which there were the kinds of coercive pressures that would have undermined his will to resist and compelled him to speak. The words and acts of the officers undoubtedly sent Newton mixed messages about whether he was free to leave, but a reasonable person in Newton's position would not have felt that he had no choice but to submit to Zwaryczuk's will

and confess. Again, this conclusion comports both with *Miranda*'s core concern regarding coercive environments, and with the holdings that individuals detained during a valid search are not in custody.

Therefore, as Newton was not in custody when Officer Zwaryczuk questioned him, his responses will not be suppressed despite the fact that *Miranda* warnings were not read to Newton before he answered.

### b. "Public Safety" Exception

Although I have concluded that Newton was not in custody during his questioning, even if this conclusion were incorrect, his responses are still admissible. The government assumes and Newton argues that Newton was in custody, and in most situations, this conclusion would result in the exclusion of any of Newton's responses to the parole officers' questions. However, the government argues that the questioning of Newton falls within the "public safety" exception to the normal requirements under *Miranda* carved out by the Supreme Court in *New York v. Quarles,* 467 U.S. 649, 104 S.Ct. 2626, 81 L.Ed.2d 550 (1984). In *Quarles,* a woman told two police officers on patrol she had just been raped and that the perpetrator had entered a nearby supermarket. She gave the officers a detailed description of the man and advised them that he was carrying a firearm. After they entered the supermarket, the officers saw a man who fit the description who then fled toward the back of the store. The officers pursued the man, quickly apprehended him, and frisked him. No gun was found, but the officers observed that the suspect was wearing an empty holster. An officer handcuffed the suspect and, without giving the *Miranda* warnings, asked him where the gun was. The man "nodded in the direction of some empty cartons and re-

sponded, 'the gun is over there.'" *Id.* at 652, 104 S.Ct. at 2629. The officers searched the empty cartons and found a firearm. At that point, the officers notified the suspect he was under arrest and read him the *Miranda* warnings. Quarles moved to suppress the statements and the gun.

■ The Court held that "on these facts there is a 'public safety' exception to the requirement that *Miranda* warnings must be given before a suspect's answers may be admitted into evidence." *Id.* at 655, 104 S.Ct. at 2631. Under the exception, when officers ask "questions necessary to secure their own safety or the safety of the public," the responses of a suspect may be admitted even if the *Miranda* warnings have not been administered. *Id.* at 659, 104 S.Ct. at 2633. The officers in *Quarles* had "every reason to believe" the gun was concealed somewhere in the supermarket. *Id.* at 657, 104 S.Ct. at 2632. It therefore posed a danger to the public and the police because "an accomplice might make use of it [or] a customer or employee might later come upon it." *Id.*

The limits of *Quarles*' "public safety" exception have not been precisely spelled out. The Supreme Court in *Quarles* notably described its holding as a "narrow exception to the *Miranda* rule." *Id.* at 658, 104 S.Ct. at 2632. In addition, by reaffirming its earlier holding in *Orozco v. Texas*, 394 U.S. 324, 89 S.Ct. 1095, 22 L.Ed.2d 311 (1969),[12] the Court indicated that an interrogation about a gun must "relate to an objectively reasonable need to protect the police or the public from any

*immediate* danger associated with the weapon." *Quarles*, 467 U.S. at 659 n. 8, 104 S.Ct. at 2633 (emphasis added). If there is no immediate danger, the *Miranda* rule should apply, not the *Quarles* exception. *See United States v. Mobley*, 40 F.3d 688, 693 (4th Cir.1994). The Second Circuit has had few opportunities to examine the "public safety" exception, applying it only in a case where the risks to the public were even greater than they were in *Quarles*. *See United States v. Khalil*, 214 F.3d 111 (2d Cir.2000) (refusing to exclude responses by an accused terrorist to police questions about a bomb in the apartment that could have exploded before it could be disarmed); *see also United States v. Anderson*, 929 F.2d 96 (2d Cir.1991) (distinguishing *Quarles* because suspect had already been given the *Miranda* warnings). *Quarles* and *Khalil* show that, at a minimum, the danger to the police or the public must be immediate and serious for the "public safety" exception to apply.

Other circuits and district courts have examined *Quarles* in more detail, and their decisions provide additional guidance. Moreover, several cases have fact patterns analogous to the case at bar. In *Mobley*, a group of eight FBI agents executed an arrest warrant on the defendant at his apartment. He answered the door naked, and was immediately handcuffed. Several agents performed a security sweep of the apartment and found no one else present. Mobley was allowed to get dressed, and on the way out an agent asked him if there was anything in the apartment, such as a weapon, that could be a danger to the agents.[13] The court distinguished *Quarles*,

---

**12.** In *Orozco,* a group of police officers surrounded a suspect in his bedroom at 4 a.m. and, without giving him his *Miranda* warnings, intensely interrogated him about whether he had been present at a shooting and whether he owned a gun.

**13.** By this time, an agent had told Mobley he was under arrest and administered the *Miranda* warnings, and Mobley had requested an attorney. The court held that *Quarles* applied to an improper interrogation after the

noting that Mobley was encountered naked, and that "by the time he was arrested, the FBI had already made a security sweep of his premises, and they had found that he was the sole individual present, and that the apartment was a residence for Mobley alone." *Id.* at 693, 104 S.Ct. 2626. Based on these facts, the court concluded that no "extraordinary circumstances" prompted the agent's question, and the "public safety" exception did not apply. *Id.*

In *United States v. Williams*, 181 F.3d 945 (8th Cir.1999), six police officers executed a search warrant on the defendant at his apartment. The officers gained entry to the apartment using a "flash-bang" device designed to distract anyone inside by creating loud noise and smoke. The officers entered the apartment, found Williams lying on a bed, and immediately placed him in handcuffs. Without giving the *Miranda* warnings, one officer asked Williams, "Is anything we need to be aware of?" Williams responded by stating there was a gun in the closet. On Williams' motion to suppress the statement, the court applied the "public safety" exception. *Id.* at 953. Even though Williams was handcuffed, the court concluded that "the officers could not have known if any armed individuals were present in the apartment or preparing to enter the apartment within a short period of time" or "whether other hazardous weapons were present in the apartment that could cause them harm if they happened upon them unexpectedly or mishandled them in some way." *Id.* at 954.

In *Mobley* and *Williams*, the suspect was handcuffed and thus did not himself pose a danger to the public or the police. What distinguishes *Williams* from *Mobley* is that in *Williams* the officers had not yet secured the residence when the suspect was questioned. The officers therefore had valid safety concerns, since other people may have been in the residence who could have posed a threat to the officers. On the other hand, the officers in *Mobley* had already conducted a safety sweep, and thus had no reasonable safety concerns. Therefore, these cases indicate that the "public safety" exception applies when officers have not had the opportunity to search and secure the residence of a handcuffed suspect.

District court cases from this circuit and other circuits support this conclusion. *See United States v. Jones*, 154 F.Supp.2d 617 (S.D.N.Y.2001) ("public safety" exception applies when suspect is in handcuffs but only part of the apartment has been searched); *United States v. Dodge*, 852 F.Supp. 139 (D.Conn.1994) (exception applies when suspect is handcuffed but an accomplice could have been in the residence and quickly assembled a bomb); *United States v. Chan*, 901 F.Supp. 480 (D.Mass.1995) (exception applies when defendant was in handcuffs but others may have been present in the apartment). The conclusion that the "public safety" exception applies when officers have not had the opportunity to search and secure the residence of a handcuffed suspect also comports with the explanation in *Quarles* that public safety was endangered because an accomplice might have used the defendant's gun.[14]

---

warnings were given. *Mobley,* 40 F.3d at 692.

**14.** Indeed, the "public safety" concerns in these cases are more compelling than they were in *Quarles* itself. Were the crime involved in *Quarles* robbery, it is unlikely, but

still conceivable, that there might have been an accomplice who would have been able to find the gun in the carton where Quarles had discarded it. But the crime was rape, and the police had no reason to believe that more than one attacker was involved. Clearly,

Finally, these cases indicate that the authorities must have some real basis to believe that weapons are present. Giving the police an automatic right to interrogate suspects based on the mere possibility that firearms are present would allow the exception to swallow the rule. *See Jones,* 154 F.Supp.2d at 628–29. As the Fourth Circuit noted, "[a]bsent other information, a suspicion that weapons are present in a particular setting is not enough, as a general matter, to demonstrate an objectively reasonable concern for immediate danger to police or public." *Mobley,* 40 F.3d at 693 n. 2. In *Quarles* itself the police had "specific reliable information that a weapon was present and a specific reason to think that the location of the gun posed a concrete danger to the public." *Jones,* 154 F.Supp.2d at 628.

These principles were well-summarized in *Jones,* a district court case from this circuit in which the court extensively examined *Quarles* and subsequent "public safety" exception cases. That court described the rule as:

> In the context of searches for weapons, this doctrine requires, at a minimum, that the authorities have some real basis to believe that weapons are present, and some specific reason to believe that the weapon's undetected presence poses a danger to the police or to the public.

*Id.* at 629.

Using these principles, the "public safety" exception applies to the situation

here. The parole officers had a real basis to believe that a firearm was present in Newton's apartment-the social worker told them that Newton's mother had reported that Newton kept a gun in the house. The gun clearly posed an immediate and serious danger to the officers and to Newton's mother and her husband. When the parole officers interrogated Newton, he was in handcuffs and did not himself pose a threat to the officers or the public. However, the parole officers questioned Newton before the officers had searched the apartment. At the time, they did not know whether there was anyone else in the apartment who could use the weapon. Indeed, in addition to Newton, Wright, and Wright's husband, another person was present in the apartment when the officers entered. Therefore, the parole officers had a legitimate safety concern when they asked Newton whether he had any contraband in the home and what was in the box at which he had nodded.

The parole officers therefore had a substantial basis to believe that a weapon was present, and a specific reason to believe that the weapon's undetected presence posed a danger to them or to the public. Accordingly, the officers' questions prior to administration of the *Miranda* warnings were prompted by a concern for public safety, and Newton's responses are admissible under *Quarles.*

(3)

Finally, even if Newton's statements were suppressed because of the pa-

---

then, something unstated was at work in *Quarles.* The best explanation for the result in *Quarles* may be that, as noted by Professor LaFave, *Miranda* rarely applies to questioning in "familiar or at least neutral surroundings." 2 LaFave and Israel, *supra,* § 6.6(e), at 532. The reasoning and policy behind *Miranda* should lead to the conclusion that warnings need not be given when the questioning occurs in public or other non-intimidating sur-

roundings. Ultimately, though, the Court did not take that approach. Rather, it decided to continue to apply *Miranda* regardless of the setting as long as there was a custodial interrogation, and created the "public safety" exception that governs when officers ask "questions necessary to secure their own safety or the safety of the public." *Quarles,* 467 U.S. at 659, 104 S.Ct. at 2633.

role officers' failure to read him the *Miranda* warnings before questioning him, the physical evidence found during the search is still admissible. Newton argues that all tangible evidence seized as a consequence of an interrogation in violation of *Miranda* should be suppressed as "fruit of the poisonous tree" under *Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). Neither the Supreme Court nor the Second Circuit has ruled definitively on whether physical evidence must be suppressed if it is derived from statements taken in violation of *Miranda, see United States v. Eggers,* 21 F.Supp.2d 261, 266 (S.D.N.Y.1998), but opinions in closely related contexts, by other circuits, and by district courts in this circuit leave no doubt that the physical evidence found during the search of Newton's apartment should not be suppressed even if Newton's statements were excluded because he was not given the *Miranda* warnings.

As the Supreme Court explained in *Oregon v. Elstad,* 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985), excluding evidence as fruit of the poisonous tree under *Wong Sun* "assumes the existence of a constitutional violation." *Id.* at 305, 105 S.Ct. at

1291.[15] That is, there must be an "actual infringement of the suspect's constitutional rights" for the fruit of the poisonous tree doctrine to apply. *Id.* at 308, 105 S.Ct. at 1292 (citing *Michigan v. Tucker,* 417 U.S. 433, 94 S.Ct. 2357, 41 L.Ed.2d 182 (1974)). For example, in *Wong Sun,* the Court excluded evidence and witnesses discovered as a result of a search that violated the Fourth Amendment. *See id.* at 305–06, 105 S.Ct. at 1291. However, "[t]he *Miranda* exclusionary rule ... sweeps more broadly than the Fifth Amendment itself." *Id.* at 306, 105 S.Ct. at 1291–92. As discussed above, the Fifth Amendment bars the prosecution from the use "only of *compelled* testimony." *Id.* at 306–07, 105 S.Ct. at 1292 (emphasis in original). The *Miranda* warnings are a prophylactic designed to protect the core Fifth Amendment privilege against self-incrimination, *see New York v. Quarles,* 467 U.S. 649, 671 n. 4, 104 S.Ct. 2626, 2639, 81 L.Ed.2d 550 (1984) (O'Connor, J., concurring in part and dissenting in part), and the mere failure to administer them to a subject of questioning is not, in itself, a violation of the Fifth Amendment. *See Elstad,* 470 U.S. at 306, 105 S.Ct. at 1291–92.[16] Ac-

---

**15.** In *Elstad,* the defendant initially confessed during an interrogation conducted before the police read him the *Miranda* warnings. *See Elstad,* 470 U.S. at 301, 105 S.Ct. at 1288–89. The police administered the warnings about one hour later, after which Elstad confessed a second time. *See id.* at 301–02, 105 S.Ct. at 1289. Elstad sought to suppress the first confession under *Miranda,* and the second one as fruit of the poisonous tree.

**16.** The reasoning of the Supreme Court's recent reaffirmation of *Miranda* in *Dickerson v. United States,* 530 U.S. 428, 120 S.Ct. 2326, 147 L.Ed.2d 405 (2000), did not destroy the viability of *Elstad.* In *Dickerson, Miranda* was called into question by a statute passed by Congress that in essence would have revived pre-*Miranda* rules under which confessions were only admissible so long as they satisfied the "due process voluntariness test."

*Id.* at 433, 120 S.Ct. at 2330 (citing *Brown v. Mississippi,* 297 U.S. 278, 56 S.Ct. 461, 80 L.Ed. 682 (1936) (test based on Fourteenth Amendment's Due Process Clause)). The Court held that *Miranda* is a constitutional rule that Congress could not supersede legislatively. *Id.* at 444, 120 S.Ct. at 2336. However, Chief Justice Rehnquist's majority opinion appeared to anticipate challenges to the viability of *Elstad* based on *Dickerson,* specifically observing that "[o]ur decision in *Elstad* ... simply recognizes the fact that unreasonable searches under the Fourth Amendment are different from unwarranted interrogation under the Fifth Amendment." *Id.* at 441, 120 S.Ct. at 2335. *Dickerson* does not offer a rationale for its distinction between Fourth and Fifth Amendment violations. Perhaps the opinion would have been better grounded in Congress' failure to offer a viable alternative to meet the concerns that *Miranda* sought

cordingly, the Court held in *Elstad* that evidence derived from an interrogation in violation of *Miranda* must be suppressed only when the suspect is subject to "actual coercion" in violation of the Fifth Amendment itself. *See id.* at 308–09, 105 S.Ct. at 1292–93.

Although *Elstad* specifically addressed two confessions of the same defendant, the principles it expressed clearly apply in other contexts. The Supreme Court reached a similar conclusion in *Tucker,* 417 U.S. at 446–50, 94 S.Ct. at 2365–67, in which it refused to suppress the testimony of a witness who was identified as a result of a statement obtained in violation of *Miranda.* Moreover, Justice O'Connor, who wrote the majority opinion in *Elstad,* concluded a year earlier in *Quarles* that physical evidence derived from a defendant's statement obtained in violation of *Miranda* should not be suppressed. *See Quarles,* 467 U.S. at 671–72, 104 S.Ct. at 2639–40 (O'Connor, J., concurring in part and dissenting in part).[17]

Likewise, every circuit that has considered the issue since *Elstad* has construed *Elstad* to apply equally to all forms of evidence derived from an interrogation that only violated *Miranda.* *See United States v. DeSumma,* 272 F.3d 176, 179–81 (3d Cir.2001) ("the fruit of the poisonous tree doctrine does not apply to derivative evidence secured as a result of a voluntary statement obtained before *Miranda* warnings are issued"); *United States v. Elie,* 111 F.3d 1135, 1142 (4th Cir.1997) (weapons "obtained as a result of an unwarned statement that was voluntary under the Fifth Amendment [not suppressed as] 'fruit of the poisonous tree' "); *United States v. Crowder,* 62 F.3d 782, 786–88 (6th Cir.1995) (admitting a shotgun discovered due to an unwarned but not coerced statement to police); *United States v. Mendez,* 27 F.3d 126, 130 (5th Cir.1994) ("A mere violation of *Miranda* 's 'prophylactic' procedures does not trigger the fruit of the poisonous tree doctrine. The derivative evidence rule operates only when an actual constitutional violation occurs, as where a suspect confesses in response to coercion."); *United States v. Wiley,* 997 F.2d 378, 382–83 (8th Cir.1993) (admitting evidence seized as a consequence of an unwarned statement because the statement and the consent to search were voluntary); *United States v. Gonzalez–Sandoval,* 894 F.2d 1043, 1048 (9th Cir.1990) ("Where there is no evidence of coercion or a denial of due process in elicitation of the statements, the object of

---

to address. In *Miranda,* the Court expressly authorized Congress and the states "to develop their own safeguards for the privilege" against self-incrimination as long as they were as effective as the *Miranda* warnings "in informing accused persons of their right of silence and in affording a continuous opportunity to exercise it." *Miranda v. Arizona,* 384 U.S. 436, 490, 86 S.Ct. 1602, 1636, 16 L.Ed.2d 694 (1966). In any case, since *Dickerson,* other courts have agreed that *Dickerson* does not overrule *Elstad.* *See United States v. DeSumma,* 272 F.3d 176, 180 (3d Cir.2001) (the Supreme Court appeared to anticipate and reject the argument that *Dickerson* would undermine *Elstad* ); *United States v. Orso,* 266 F.3d 1030, 1035 n. 3 (9th Cir.2001) (same); *United States v. Bin Laden,* 2001 WL 30061, at

\*3 n. 4 (S.D.N.Y. Jan. 2, 2001) (*Dickerson* did not disturb the relevant holding in *Elstad* ). *But see United States v. Kruger,* 151 F.Supp.2d 86, 100–02 (D.Me.2001) (applying "fruit of the poisonous tree" doctrine because *"Dickerson* changed the landscape … by conferring constitutional status on the *Miranda* right to a warning").

**17.** In addition to discussing the rationales later adopted in *Elstad,* Justice O'Connor also argued that physical evidence is similar to non-testimonial evidence (such as blood tests) that is admissible in the absence of *Miranda* warnings. *See Quarles,* 467 U.S. at 666–69, 104 S.Ct. at 2637–38 (O'Connor, J., concurring in part and dissenting in part).

the fifth amendment exclusionary rule—assuring trustworthiness of evidence introduced at trial—is not served by barring admission of the derivatively obtained evidence or statements."). In a similar context, the Second Circuit tracked the analysis of *Elstad* and concluded where there was "no indication of trickery or coercion" by the police, it was permissible to use a statement obtained without *Miranda* warnings to determine probable cause. *See United States v. Morales*, 788 F.2d 883, 885–87 (2d Cir.1986).

In addition, at least three district courts in this circuit have extended *Elstad* to include all forms of derivate evidence, including physical evidence. *See United States v. Bin Laden*, 2001 WL 30061, at *2–3 (S.D.N.Y. Jan. 2, 2001) ("Thus, evidence (whether physical or testimonial) derived from 'unwarned' statements is not excluded unless the original statements were made involuntarily."); *Eggers*, 21 F.Supp.2d at 266 (concurring with the analysis "that fruits of *Miranda* violations are to be suppressed only upon a showing of actual coercion"); *United States v. Guzman*, 11 F.Supp.2d 292, 297 (S.D.N.Y.1998) ("Therefore, physical evidence derived from a statement obtained in violation of *Miranda* is admissible absent evidence of coercion or other misconduct on the part of law enforcement officers sufficiently egregious to offend due process.").

Applying this overwhelming case law, it is clear that even if there were a violation of *Miranda* in the parole officers' questioning of Newton, the physical evidence gathered in the search of his mother's home should only be suppressed if Newton's statements were a product of actual coercion. In *Elstad*, the Supreme Court defined actual coercion as "physical violence or other deliberate means calculated to break the suspect's will." *Elstad*, 470 U.S. at 312, 105 S.Ct. at 1285. Here,

Newton was not actually coerced by physical violence or powerful psychological pressures. While he was handcuffed and possibly in the presence of several parole and police officers during the questioning, these circumstances are very far from actual coercion. *See, e.g., Guzman*, 11 F.Supp.2d at 298–99 (confession of suspect questioned all night at station-house not coerced). Accordingly, even if there were a violation of *Miranda* in the parole officers' questioning of Newton, the gun, the loaded clip, the loose rounds, and all other physical evidence gathered during the search would not be suppressed.

## Conclusion

The search of Newton's mother's apartment was conducted pursuant to a regulation that itself satisfied the Fourth Amendment's reasonableness requirement. Therefore, Newton's motion to suppress the evidence gathered during that search is denied. Newton was not in custody when the parole officers interrogated him, so the parole officers did not need to read him the *Miranda* warnings before questioning him. Even if Newton was in custody at the time, his motion would be denied because the officers' questions were prompted by a reasonable concern for public safety. Thus, Newton's motion to suppress his responses is denied despite the parole officers' failure to administer the *Miranda* warnings. Nor would the physical evidence be excluded even if the statements were suppressed due to the parole officers failure to read Newton the *Miranda* warnings because the "fruit of the poisonous tree" doctrine does not apply here. Accordingly, all of the Newton's motions are denied.

SO ORDERED.