# Illinois Official Reports

## Appellate Court

---

### *People v. Coleman*, 2015 IL App (4th) 140730

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellant, v. STEPHEN C. COLEMAN, Defendant-Appellee. |
| District & No. | Fourth District<br>Docket No. 4-14-0730 |
| Filed | July 20, 2015 |
| Decision Under Review | Appeal from the Circuit Court of Sangamon County, No. 13-CF-749; the Hon. Peter C. Cavanagh, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | John Milhiser, State's Attorney, of Springfield (Dan Mosher, Assistant State's Attorney, and Patrick Delfino, David J. Robinson, and Linda Susan McClain, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.<br><br>Michael J. Pelletier, Jacqueline L. Bullard, and Duane E. Schuster, all of State Appellate Defender's Office, of Springfield, for appellee. |
| Panel | PRESIDING JUSTICE POPE delivered the judgment of the court, with opinion.<br>Justice Harris concurred in the judgment and opinion.<br>Justice Steigmann dissented, with opinion. |

**OPINION**

¶ 1    On August 22, 2013, the State charged defendant, Stephen C. Coleman, with manufacture/delivery of cannabis (720 ILCS 550/5(d) (West 2012)) and possession of cannabis (720 ILCS 550/4(d) (West 2012)). On July 20, 2014, the trial court granted defendant's motion to suppress statements he made to parole officers because he was not provided warnings pursuant to *Miranda v. Arizona*, 384 U.S. 436 (1966). The State appeals, arguing the court erred in granting defendant's motion to suppress. We affirm.

¶ 2                                      I. BACKGROUND

¶ 3    On February 3, 2014, defendant filed a motion to suppress statements he made to parole officers on August 6, 2013. At issue was defendant's purported statement he had marijuana under his mother's bed. Defendant argued his statement resulted from a custodial interrogation where the parole officers failed to advise him of his *Miranda* rights prior to questioning.

¶ 4    On February 26, 2014, the trial court held a hearing on defendant's motion to suppress. Defendant testified he was visiting his mother at 546 West Miller Street in Springfield at approximately 9:30 a.m. on August 6, 2013, and was on parole at the time. When he called the Department of Corrections for his monthly check-in, defendant was told his parole officer was looking for him. Defendant provided his mother's address. Shortly thereafter, a parole agent, Mark Brady, and another parole agent, Mark Schafer, arrived at defendant's mother's residence. Defendant testified his registered address was 1338 North 8th Street and he had not changed his parole address.

¶ 5    Agent Brady asked defendant to provide a urine sample. Defendant and the two agents went into his mother's apartment. Defendant's mother and girlfriend were inside the apartment. However, defendant was kept separated from these individuals during the encounter. Defendant provided the sample in his mother's bathroom in Brady's presence. While defendant was providing the sample, Agent Schafer was searching what he believed was defendant's bedroom. Schafer found a lockbox with money inside. According to defendant, after Schafer found the money, Brady cuffed defendant. They then questioned him about the money.

¶ 6    The agents took defendant back into the bathroom. Shortly thereafter, they began questioning him about allegations he was selling drugs. He was still handcuffed at that time. They also asked if he had drugs in the residence. The agents did not advise defendant of his *Miranda* rights prior to questioning him.

¶ 7    Defendant testified he was not afraid of the parole officers and had been handcuffed (behind his back) for approximately five minutes before the agents questioned him about dealing drugs. The agents did not take out any weapons during the encounter and no police officers were present.

¶ 8    On redirect examination, the following exchange occurred between defense counsel and defendant:

> "[DEFENSE COUNSEL]: [Defendant], did you believe you were–when they handcuffed you, did you believe that you could leave?
> [DEFENDANT]: Yes.

> [DEFENSE COUNSEL]: So you thought that you could leave when they had you handcuffed?
>
> [DEFENDANT]: Yes. I hadn't done anything wrong.
>
> [DEFENSE COUNSEL]: I'm not asking you to admit that you did anything wrong. Did you believe you were under arrest when they put you in handcuffs?
>
> [DEFENDANT]: No."

Defendant also testified he was kept apart from his mother and girlfriend while he was being questioned by the agents. He could not hear them talking, and he did not think they could hear him talking.

¶ 9 After defendant testified, the State moved to dismiss defendant's motion to suppress, arguing defendant had failed to establish a *prima facie* case a *Miranda* violation had occurred. The trial court granted the State's motion to dismiss, stating:

> "The investigation of this violation of probation was an appropriate investigation. I do find there was a valid waiver based upon People's 1, the plain language of the parole mandatory supervised release agreement.
>
> Also, the court is clearly troubled by the testimony of the Defendant, that he did not feel at the time of the questioning that he was under arrest at that time. So with regard to *Miranda*, the Court does not find there's a prior violation [*sic*] and that the burden has not shifted."

¶ 10 On July 15, 2014, defendant filed a motion asking the trial court to reconsider its dismissal of his motion to suppress. Defendant argued the court erred in failing to shift the burden to the State to show defendant's questioning complied with *Miranda* or fell into one of the rule's exceptions. The court granted defendant's motion to reconsider and held another hearing on the suppression issue that afternoon.

¶ 11 At the hearing, the State first called parole agent Brady. Brady testified he is not considered a general criminal investigator. When he witnesses evidence of a new crime by a parolee, he calls the local police to work on the new crime. He never gives *Miranda* warnings to parolees during compliance checks.

¶ 12 Brady testified he did a compliance check on defendant at the Miller Street address because defendant had reported a change of address to that location. Brady testified he suspected defendant was selling drugs because of numerous calls the parole office had received. Defendant told Brady the apartment on Miller Street was his. Brady told defendant he was going to conduct a compliance check and asked defendant to provide a urine sample. Defendant agreed to do so and told Brady he would test positive for marijuana. While defendant was providing the urine sample, parole agent Schafer began searching defendant's room in the apartment.

¶ 13 While defendant was providing the urine sample, Agent Schafer found a "locked box" in defendant's bedroom. Brady took defendant into the bedroom and requested defendant open the box. Defendant consented and opened the box. Brady then handcuffed defendant behind his back. According to Brady, handcuffing a parolee during a compliance check is standard operating procedure. The box contained a large amount of cash and some other items. Brady asked defendant how he acquired a large amount of cash considering he was unemployed. Defendant said he earned the money doing yard work.

¶ 14        After asking defendant about the money in the box, Brady and Schafer asked defendant three or four more questions. Brady testified the agents told defendant they suspected he had been selling marijuana. The agents told defendant they wanted him to be honest with them and asked defendant whether he had anything in the home. Defendant told the agents he had some marijuana under his mother's bed. Defendant had only been handcuffed a few minutes when he told the agents about the marijuana. During the questioning, defendant was cooperative.

¶ 15        Brady then asked defendant's mother if he could search her bedroom, and she consented. Brady found boxes under her bed containing marijuana. After finding the drugs, the parole agents called the Springfield police to the scene.

¶ 16        According to Brady, the entire encounter only took 15 to 20 minutes. Neither parole agent drew his firearm. Brady testified they did not threaten, bribe, or trick defendant into making any admissions. They also did not threaten him with arrest or a parole violation prior to his statement regarding the marijuana. Further, the police had no involvement in initiating the compliance check or in how the check was conducted. Defendant remained handcuffed while they waited for the Springfield police to arrive.

¶ 17        On cross-examination, Brady stated he had several anonymous tips defendant was selling marijuana prior to conducting the compliance check. Defendant was reportedly selling marijuana from his parole address on North 8th Street. It was also reported he was going in and out of his car during these drug sales.

¶ 18        Brady testified no drugs were found in defendant's car, on his person, or in what they believed was defendant's bedroom. Brady acknowledged his report noted defendant was not handcuffed until after defendant said he earned the money found in the bedroom by performing yard work. While the agents were questioning defendant, he was not allowed to consult with anyone and was kept separate from his mother and girlfriend. Brady testified the questioning occurred in the bedroom of the apartment. Both Brady and Schafer were armed. Brady was wearing his gun on the outside of his clothes, where it was visible.

¶ 19        Parole agent Schafer testified the agents had no intent to arrest defendant when they asked him if there were any drugs in the house. While searching defendant's room, Schafer found a lockbox. When defendant finished the drug test, Schafer told Brady he needed defendant to open the lockbox. Brady then questioned defendant about money found in the lockbox. Defendant was handcuffed after he opened the lockbox. Once he was handcuffed, defendant was not going to be allowed to leave. In fact, Schafer testified defendant was never allowed to leave of his own volition that morning. Schafer testified defendant was not given his *Miranda* warnings. According to Schafer, it is standard for agents to ask whether there is anything illegal or there are any weapons the agents should know about. Schafer testified no one else was permitted in the room with the agents and defendant. Defendant's mother and girlfriend were directed to stay out of the bathroom. Agent Schafer testified neither defendant, his mother, nor his girlfriend was going to be allowed to leave the apartment during the encounter. Cannabis was later found in defendant's mother's room.

¶ 20        On July 30, 2014, the trial court granted defendant's motion to suppress. The court stated:

         "The resident check of the parolee's residence, certainly it would be permissible for drug testing, questioning, search, even the cuffing of the Defendant-parolee for the safety of the officers, and I really don't see where any of that would be a violation of the parole agreement. However, the facts and circumstances in this case, in the Court's

view, turned a resident check of a parolee to that of a custodial interrogation which invoked the right to *Miranda* warnings.

"You know, if the–at the point, I should say, of the questioning, which certainly would be permissible as regards to compliance with parole terms, but investigation of a new crime wherein there was a tip, and I did hear testimony of the parole officer that stated that the Defendant was not free to leave while handcuffed and being questioned. Those are very important factors in this particular case.

"We have security personnel acting in a coordinated effort bringing in a partner to question the suspect after making arrangements to be paged and go see the parolee-Defendant, search his home, handcuffed him, with the knowledge that there was a tip, and I think that's the key, and I'm just trying to make the point that the tip is very, very crucial in this case, which otherwise may have been an impermissible parole check.

"The tip leads the parole officer there, and when coupled with the tip, evidence of a new crime, that being the money, for this Court, that is enough–in the context of a handcuffed parolee and testimony that he was not free to leave is enough to invoke his right to *Miranda*."

On August 13, 2014, the State filed a certificate of impairment and declaration it intended to appeal.

¶ 21    This appeal followed.

¶ 22                                    II. ANALYSIS

¶ 23    The State argues the trial court erred in granting defendant's motion to suppress. According to the State, Agents Brady and Schafer were under no duty to advise defendant of his *Miranda* rights. Because of the conditions related to his mandatory supervised release, the State contends defendant was required to truthfully answer his parole officer's questions. Further, the State argues defendant was not subjected to a custodial interrogation. Because the State concedes defendant was not Mirandized prior to making the statements at issue, the question becomes whether defendant's statements resulted from a custodial interrogation.

¶ 24                                 A. Standard of Review

¶ 25    Suppression rulings present a mixed question of law and fact. *People v. Pitman*, 211 Ill. 2d 502, 512, 813 N.E.2d 93, 100 (2004). A trial court's factual findings should be upheld unless they are against the manifest weight of the evidence. *Id.* However, whether the evidence should be suppressed is a question of law, which we review *de novo*. *Id.* at 512, 813 N.E.2d at 101.

¶ 26                          B. Custody for *Miranda* Purposes

¶ 27    Our supreme court has stated courts should engage in a two-part inquiry to determine whether a person is in custody, necessitating *Miranda* warnings prior to questioning the individual. First, courts should look at the circumstances surrounding the interrogation. Second, courts should determine whether a reasonable person, innocent of any crime, would have felt at liberty to terminate the interrogation and leave given those circumstances. *People v. Braggs*, 209 Ill. 2d 492, 505-06, 810 N.E.2d 472, 481 (2003).

¶ 28 Although defendant was on parole, the United States Supreme Court has made the following clear: "A defendant does not lose [his fifth-amendment] protection by reason of his conviction of a crime; notwithstanding that a defendant is imprisoned or on probation at the time he makes incriminating statements, if those statements are compelled they are inadmissible in a subsequent trial for a crime other than that for which he has been convicted." *Minnesota v. Murphy*, 465 U.S. 420, 426 (1984). The State acknowledges a parolee, like a probationer, does not lose his privilege against self-incrimination. However, citing *Murphy*, the State argues the Supreme Court has not extended the requirements of *Miranda* warnings to prearranged, routine parole interviews with parole officers. Further, the State argues the parole agents were under no duty to advise defendant of his *Miranda* rights because defendant was under parole supervision and was required, as a condition of his mandatory supervised release, to truthfully answer his parole officer's questions relating to his adjustment in the community while on parole. See 730 ILCS 5/3-3-7(a)(14) (West 2012).

¶ 29 However, based on the facts here, *Murphy* supports the trial court's decision to suppress defendant's statements in this case. In *Murphy*, the defendant, who was on probation, admitted to his treatment counselor he committed a rape and murder in 1974. *Murphy*, 465 U.S. at 423. Upon receiving this information, the probation officer contacted the defendant to set up a meeting to discuss a treatment plan for the remainder of his probationary period. *Id.* The probation officer did not contact the police prior to the meeting but knew she would report to the police any incriminating statements the defendant made. *Id.* At the meeting at her office, the officer told the defendant she had information from his treatment counselor evidencing his continued need for treatment. *Id.* at 423-24. Subsequently, defendant admitted committing the rape and murder but attempted to persuade the probation officer he did not need further treatment because "several extenuating circumstances explained the prior crimes." *Id.* at 424.

¶ 30 The probation officer told the defendant she had a duty to report to the police what the defendant told her and encouraged him to turn himself in to the authorities. *Id.* The defendant left after the interview. *Id.* Two days later, he informed the probation officer he was not turning himself in on advice of counsel. *Id.* A grand jury later indicted the defendant for first degree murder. *Id.* at 425. The defendant moved to suppress his confession, arguing it was made in violation of the fifth and fourteenth amendments. The trial court denied his motion, but the Minnesota Supreme Court reversed. *Id.*

¶ 31 The United States Supreme Court noted an individual's obligation to appear and truthfully answer questions does not, in and of itself, convert otherwise voluntary statements into compelled statements. *Id.* at 427. According to the Court, individuals on probation or parole are:

"in no better position than the ordinary witness at a trial or before a grand jury who is subpoenaed, sworn to tell the truth, and obligated to answer on the pain of contempt, unless he invokes the privilege and shows that he faces a realistic threat of self-incrimination. The answers of such a witness to questions put to him are not compelled within the meaning of the Fifth Amendment unless the witness is required to answer over his valid claim of the privilege. This much is reasonably clear from our cases.

***

*** It has long been recognized that '[t]he Constitution does not forbid the asking of criminative questions,' [citation], and nothing in our prior cases suggests that the

- 6 -

incriminating nature of a question, by itself, excuses a timely assertion of the privilege. [Citation.] If a witness–even one under a general compulsion to testify–answers a question both he and the government should reasonably expect to incriminate him, the Court need ask only whether the particular disclosure was 'compelled' within the meaning of the Fifth Amendment." *Id.* at 427-28.

¶ 32    The Supreme Court noted, when the government asks a witness questions reasonably likely to elicit incriminating evidence, the witness must assert the privilege rather than answer if he does not want to incriminate himself. *Id.* at 429.

"If he asserts the privilege, he 'may not be required to answer a question if there is some rational basis for believing that it will incriminate him, at least without *at that time* being assured that neither it nor its fruits may be used against him' in a subsequent criminal proceeding [citation] (emphasis in original). But if he chooses to answer, his choice is considered to be voluntary since he was free to claim the privilege and would suffer no penalty as the result of his decision to do so." *Id.*

¶ 33    The Supreme Court then discussed the well-known exception to this general rule with regard to custodial interrogations. *Id.* To lessen the risk of an individual being compelled by the isolation of police custody, the Court in *Miranda* "required the exclusion of incriminating statements obtained during custodial interrogation unless the suspect fails to claim the Fifth Amendment privilege after being suitably warned of his right to remain silent and of the consequences of his failure to assert it." *Id.* at 430. The Court noted "this extraordinary safeguard 'does not apply outside the context of the inherently coercive custodial interrogations for which it was designed.' " *Id.* Because the defendant's statements were not made during a custodial interrogation, the Supreme Court found *Miranda* did not apply. *Id.* at 431.

¶ 34    Noting the Minnesota Supreme Court recognized the defendant was not in custody when he made the incriminatory statements, the Court stated:

"Since [the defendant] was not physically restrained and could have left the office, any compulsion he might have felt from the possibility that terminating the meeting would have led to revocation of probation was not comparable to the pressure on a suspect who is painfully aware that he literally cannot escape a persistent custodial interrogator." *Id*. at 433.

¶ 35    Unlike *Murphy*, the parole agents handcuffed defendant in this case, and custody is at issue. The State points out "custody" has been narrowly circumscribed for *Miranda* purposes. See *Oregon v. Mathiason*, 429 U.S. 492, 494-95 (1977). The Illinois Supreme Court has stated:

"The determination of whether a defendant is 'in custody,' and, therefore, whether the warnings set forth in *Miranda* are required, involves ' "[t]wo discrete inquiries ***: first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave." ' [Citation.] When examining the circumstances of interrogation, this court has found a number of factors to be relevant in determining whether a statement was made in a custodial setting, including: (1) the location, time, length, mood, and mode of the questioning; (2) the number of police officers present during the interrogation; (3) the presence or absence of family and friends of the individual; (4) any indicia of a formal arrest procedure, such as the show of weapons or force, physical restraint, booking or fingerprinting; (5) the manner by which the

individual arrived at the place of questioning; and (6) the age, intelligence, and mental makeup of the accused. [Citations.] After examining and weighing these various factors, we then must make an objective determination as to whether, under the facts presented, 'a reasonable person, innocent of any crime' would have believed that he or she could terminate the encounter and was free to leave." *People v. Slater*, 228 Ill. 2d 137, 150, 886 N.E.2d 986, 994-95 (2008).

¶ 36    According to the State, "Under the narrow standard appropriate in the *Miranda* context, it is clear that defendant was not in custody for purposes of receiving *Miranda* protection since there was no formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." We disagree.

¶ 37    In looking at the factors we are to consider, we find the following. First, defendant was in a location familiar to him. He was not taken to an interrogation room or jail. Further, defendant was subjected to relatively brief, around 20 minutes, questioning. Second, two parole officers were present, both of whom were armed. Brady's weapon was ordinarily holstered on the outside of his clothing–so it would have been in plain view. Third, defendant was separated from his mother and girlfriend while he was questioned in the bathroom. Fourth, defendant was physically restrained by handcuffs. Fifth, defendant was at his mother's residence when the parole officers arrived. Sixth, defendant was 30 years old. Defendant's intelligence and mental condition are not discernible from the record.

¶ 38    In this case, the parole agents handcuffed defendant and then questioned him about illegal drug activity of which they had advanced knowledge. When a law enforcement officer places handcuffs on an individual, the officer is making a show of force and physically restraining the individual. Handcuffing an individual by a state officer is indicative of an arrest. When a reasonable person is placed in handcuffs by law enforcement, he will not feel free to leave until the handcuffs are removed. Defendant's subjective belief he was free to leave was unreasonable and irrelevant to our determination. See *Stansbury v. California*, 511 U.S. 318, 323 (1994).

¶ 39    The State argues the parole officers did nothing wrong in handcuffing defendant. Further, according to the State, "[t]he fact defendant was handcuffed does not automatically establish that he was in custody for Fifth Amendment purposes."

¶ 40    The Supreme Court has held, for fourth amendment purposes, a search warrant founded on probable cause implicitly carries with it the limited authority to detain occupants of the premises. *Michigan v. Summers*, 452 U.S. 692, 704-05 (1981). Further, this court has held handcuffing a suspect does not transform a *Terry* stop (*Terry v. Ohio*, 392 U.S. 1 (1968)) into an arrest. *People v. Waddell*, 190 Ill. App. 3d 914, 928, 546 N.E.2d 1068, 1076 (1989). However, "[h]andcuffs are generally recognized as a hallmark of a formal arrest." *United States v. Newton*, 369 F.3d 659, 676 (2d Cir. 2004) (citing *New York v. Quarles*, 467 U.S. 649, 655 (2d Cir. 1984)).

¶ 41    In this case, the parole officers' ability to detain defendant with handcuffs is not at issue. Defendant does not argue the parole agents violated his rights by handcuffing him. Instead, defendant argues his statements were inadmissible because he was handcuffed–and thus in custody–and then made the statements at issue in response to interrogation about a criminal act for which he had not been charged.

¶ 42    The State concedes in its brief the parole agents' "home visit evolved into an investigation of a parole violation that focused on the possession of drugs inside defendant's residence." However, the State argues the agents' investigation:

> "was not specifically designed to elicit admission of an unrelated and independent crime. Therefore, even though the parole officer questioned defendant regarding the anonymous tip concerning drug sales, the compliance check was not turned into a custodial interrogation. Whether there were any drugs, weapons, or anything illegal in the home that the parole officer should know about was a standard question asked during every parole compliance check."

However, in this case, the parole agents already suspected defendant was dealing drugs. Further, only after the agents found the large amount of money in the safe, which furthered their suspicions about ongoing illegal activity, did they handcuff defendant and interrogate him about the presence of drugs, weapons, or anything illegal in the home. A reasonable person would have assumed a routine parole visit had transformed into an arrest because defendant was only handcuffed after the parole agents found a large amount of money and questioned how he acquired it.

¶ 43    The State cites an opinion from the Court of Appeals of New Mexico for the proposition the handcuffing in this case was entirely reasonable and not coercive. See *State v. Hermosillo*, 336 P.3d 446 (N.M. Ct. App. 2014). The New Mexico court found the defendant was not in custody under the specific facts of that case and, therefore, no *Miranda* warnings were required. *Id.* at 448. The New Mexico court stated "[t]he following factors guide our inquiry [into whether the custody requirement is met]: 'the purpose, place, and length of interrogation[,] ... the extent to which the defendant is confronted with evidence of guilt, the physical surroundings of the interrogation, the duration of the detention, and the degree of pressure applied to the defendant.' " *Id.* at 450 (quoting *State v. Munoz*, 1998-NMSC-048, ¶ 40, 126 N.M. 535, 972 P.2d 847). Illinois courts look at different factors to determine whether a suspect is in custody, including "any indicia of a formal arrest procedure, such as the show of weapons or force, physical restraint, booking or fingerprinting." *Slater*, 228 Ill. 2d at 150, 886 N.E.2d at 995. As a result, we do not find *Hermosillo* persuasive.

¶ 44    The State also relies on *United States v. Newton*, 181 F. Supp. 2d 157, 173 (E.D.N.Y. 2002), for the proposition handcuffing a defendant does not transform a detention into custody for *Miranda* purposes. In *Newton*, like the case *sub judice*, the defendant was on parole. The defendant's mother had reported to a parole officer the defendant possessed a gun, which he kept in a box by the door of her home, and threatened to kill her and her husband. *Id.* at 159. The defendant occasionally stayed as an overnight guest at his mother's home. *Id.* The next day, three parole officers and three police officers went to the defendant's mother's home. *Id.* at 160. When the defendant answered the door, his parole officer asked him to step outside and turn around. *Id.* The officer then handcuffed the defendant but advised the defendant he was not under arrest. *Id.*

¶ 45    The officers then took the defendant back inside the residence and sat him on a chair just inside the door. *Id.* The defendant's parole officer asked where the defendant's mother was, and defendant said she was in the back of the residence. *Id.* Another parole officer then began questioning the defendant, asking whether the defendant had any contraband in the home. *Id.* The defendant responded, " 'only what is in the box.' " *Id.* When asked what was in the box, the defendant said, " 'a two and two.' " *Id.* The parole officer opened the box and found an

unloaded .22-caliber firearm, a fully loaded magazine, and several loose rounds. *Id.* The officer testified the defendant's parole was revoked automatically and he was then under arrest. *Id.* No one read the defendant the *Miranda* warnings before or during his questioning or arrest. *Id.*

¶ 46 The federal district court denied the defendant's motion to suppress the statements he made in response to the parole officers' questions. *Id.* at 175. The court found the defendant was not in custody for *Miranda* purposes. *Id.* Relying on the Second Circuit's opinion in *United States v. Morales*, 834 F.2d 35, 38 (2d Cir. 1987), the district court found the proper test to apply to determine custody for *Miranda* purposes was "whether the 'questioning was conducted in custodial settings that have inherently coercive pressures that tend to undermine the individual's will to resist and to compel him to speak.' " *Newton*, 181 F. Supp. 2d at 168 (quoting *Morales*, 834 F.2d at 38). The court found focusing on "the presence of indications that the defendant was not free to leave is over-inclusive." *Id.* at 169. According to the court:

> "I believe that the *Morales* formulation adheres more closely to *Miranda*'s central concern that the police will use coercive environments and psychological tactics to compel subjects of questioning to confess. The language in [*Tankleff v. Senkowski*, 135 F.3d 235, 243-44 (2d Cir. 1998),] that focuses on the presence of indications that the defendant was not free to leave is over-inclusive. There are many situations in which there are powerful indications that the suspect was not free to leave in which coercive pressures to confess are absent. [Citations.] Indeed, even a fully law-abiding citizen would not feel free to leave during nearly all interactions with the police. *** In my view, the *Morales* formulation is the appropriate approach to determine whether a person is in custody ***." *Id.*

The court found "the core concerns of *Miranda* were not implicated" in the parole officer's questioning of the defendant. *Id.* at 173. According to the court:

> "While there were indications that [the defendant] was not free to leave, a reasonable person in his position also would not have felt placed in a coercive environment in which he has no choice but to submit to the parole officer's will and confess. This conclusion is supported by an analysis of the factors courts have used to determine whether an individual was in custody." *Id.*

The court noted Newton was at home and the officers told him he was not under arrest. *Id.*

¶ 47 While the district court's reasoning might support reversing the trial court in this case, the Second Circuit did not find so when the defendant in *Newton* appealed. The Second Circuit found the defendant was in custody for *Miranda* purposes. The Second Circuit stated:

> "We take this opportunity to clarify how the free-to-leave test referenced in *Tankleff* and the coercive-pressures test referenced in *Morales* both serve to identify circumstances requiring *Miranda* warnings. The free-to-leave inquiry constitutes a necessary, but not determinative, first step in establishing *Miranda* custody. The 'ultimate inquiry' for determining *Miranda* custody, however, is that articulated by the Supreme Court in *California v. Beheler*: 'whether there is a "formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." [Citations.] In such cases–i.e., where a person formerly at liberty is subjected to formal arrest or arrest-like restraints–specific coercive pressures need not be proved to establish *Miranda* custody; rather, *coercive pressures are presumed from the fact of such custody*. [Citation.]

*United States v. Morales* is not at odds with this conclusion; it simply presents circumstances where it made little sense to ask whether the defendant had been questioned pursuant to formal arrest or arrest-like restraints. Morales was a prison inmate at the time of the challenged questioning; thus, incarceration, not liberty, was his status quo. We have declined, however, to equate such incarceration with custody for purposes of *Miranda*. [Citations.] It is in the particular context of prison interrogation that *Morales*'s focus on the coercive pressures of a custodial setting must be understood. Thus, while the *Morales* formulation of custody relied on by the district court may be useful in cases involving interrogation of individuals already incarcerated on other crimes, for a person not so confined, the appropriate inquiry remains simply whether his freedom of action has been 'curtailed to a "degree associated with formal arrest." ' [Citation.] No consideration of additional coercive pressures is required." (Emphasis added.) *Newton*, 369 F.3d at 670-71.

In addition, the Second Circuit stated:

"[A]lthough coercive pressure is *Miranda's* underlying concern, custody remains the touchstone for application of its warning requirement. The test for custody is an objective one: 'whether a reasonable person in defendant's position would have understood himself to be subjected to the restraints comparable to those associated with a formal arrest.' *United States v. Ali*, 68 F.3d 1468, 1472 (2d Cir. 1995) (internal quotation marks omitted). Focusing on this objective standard has the advantage–certainly from the perspective of the hundreds of thousands of law enforcement officers who must daily apply *Miranda*–of establishing a regular course of procedure. It does not require officers to administer *Miranda* warnings based on a self-assessment of their actions as 'coercive'; rather, it instructs them to administer warnings whenever they place a person under formal arrest or apply restraints generally understood as comparable to those of a formal arrest." *Id.* at 671-72.

¶ 48    Based on the facts in *Newton*, which have many similarities to the case *sub judice*, the Second Circuit held "a reasonable person would have understood that his interrogation was being conducted pursuant to arrest-like restraints." *Id.* at 677. According to the Second Circuit:

"Although a reasonable person told, as [the defendant] was, that he was not under arrest would likely have understood that he was not about to be removed from his home to the police station–a significant factor in assessing the degree to which one is at 'the mercy' of the authorities, [citation]–a reasonable person would also have understood that as long as the handcuffs remained in place, his freedom of movement, even within his home, would be restricted to a degree comparable to that of an individual placed under formal arrest. The record does not indicate whether [the defendant] was told that the specific reason for a safety concern in his case was that the officers were searching for a gun. Thus, we cannot assume that a reasonable person in his situation would have understood that the handcuffing would likely last only until the officers had completed their search. Neither can we assume an understanding that removal or maintenance of the handcuffs depended on the outcome of the search rather than on the suspect's responding to questions posed. Because *Miranda's* safeguards 'become applicable as soon as a suspect's freedom of action is curtailed to a degree associated with formal arrest,' [citation] (internal quotation marks omitted), we must conclude that handcuffing [the defendant], though reasonable to the officers' investigatory purpose

- 11 -

under the Fourth Amendment, nevertheless placed him in custody for purposes of *Miranda.*" *Id.*

We find the Second Circuit's reasoning persuasive.

¶ 49    In the case *sub judice*, defendant's freedom was limited to a degree associated with a formal arrest. As stated earlier, a reasonable person in defendant's position would have believed a parole visit had morphed into an arrest, considering defendant was cuffed only after the parole agents found a large amount of cash and questioned him as to how he acquired the money.

¶ 50    Finally, we address the State's argument the trial court erred in granting defendant's motion to suppress because defendant testified he believed he was free to leave, even when handcuffed. Citing several decisions from this court, the State argues the threshold issue implicit in any defendant's motion to suppress a statement is whether the defendant subjectively believed he was in custody during the interrogation. See *People v. Gorman*, 207 Ill. App. 3d 461, 469, 565 N.E.2d 1349, 1354 (1991); *People v. Goyer*, 265 Ill. App. 3d 160, 164-65, 638 N.E.2d 390, 393 (1994); *People v. Griffin*, 385 Ill. App. 3d 202, 211-12, 898 N.E.2d 704, 712 (2008); *People v. Wright*, 2011 IL App (4th) 100047, ¶ 36, 960 N.E.2d 56.

¶ 51    The Third District has rejected the subjective-belief line of reasoning found in this court's opinions cited by the State. See *People v. Carroll*, 318 Ill. App. 3d 135, 742 N.E.2d 1247 (2001). In *Carroll*, after receiving information the defendant had implicated himself in the death of his brother 36 years earlier, two police officers went to the elderly care facility where the defendant lived to speak with him. *Id.* at 137, 742 N.E.2d at 1248. The defendant agreed to the officers' request to accompany them to the local police department. *Id.* The police officers had informed the defendant he was not under arrest, nor in custody, and was free to leave at any time. *Id.* at 137, 742 N.E.2d at 1249.

¶ 52    The police officers transported the defendant to the police station in an unlocked police car, and the defendant was not handcuffed. *Id.* After arriving at the police station, the officers took defendant into an 8-foot by 12-foot windowless interview room. *Id.* Once again, the officers told the defendant he was not under arrest and could leave at any time. *Id.* The officers never read defendant his *Miranda* rights. *Id.* During the 30- to 45-minute interview, the defendant eventually confessed. *Id.* Following his admission, the officers asked the defendant to provide a taped statement, again informing the defendant he was not under arrest and was free to leave at any time. *Id.* The police officers still had not given him *Miranda* warnings. *Id.* The defendant then provided a taped statement concerning his involvement in his brother's death. *Id.* After his statement, the defendant was photographed and taken back to his residence. *Id.*

¶ 53    The trial court found the defendant was not in custody when he made his initial statements to the police. *Id.* at 138, 742 N.E.2d at 1249. However, the court found the defendant should have been given *Miranda* warnings after he admitted to murder "because, upon admitting to the crime of murder, a reasonable person would believe that he was in custody." *Id.* As a result, the court suppressed the defendant's taped confession. *Id.*

¶ 54    On appellate review, relying on this court's opinions in *Gorman*, *Goyer*, and *People v. Lewis*, 269 Ill. App. 3d 523, 646 N.E.2d 305 (1995), the State argued the defendant was required to present evidence he subjectively believed "he was in custody in order to trigger the protections afforded by *Miranda.*" *Carroll*, 318 Ill. App. 3d at 138, 742 N.E.2d at 1250. Citing *People v. Melock*, 149 Ill. 2d 423, 440, 599 N.E.2d 941, 948 (1992), and *Stansbury*, 511 U.S. at 319-22, the Third District rejected "the subjective test proposed by [those] cases as it

contradicts the vast majority of legal precedent and other authority which states that the test for custody is strictly an objective one." *Carroll*, 318 Ill. App. 3d at 139, 742 N.E.2d at 1250. The Third District then stated:

> "It is apparent that defendant voluntarily accompanied the two officers to the department and that he was informed, even after his fourth oral statement, that he was not under arrest and free to leave at any time. Additionally, at no time was defendant physically restrained.
>
> However, it is equally apparent that the investigation had become focused exclusively upon defendant at the time his taped confession was made. Moreover, defendant knew that the officers suspected him of murder because he had just, moments earlier, inculpated himself in the crime. Considering these facts, the trial court's finding that any reasonable person in defendant's position would have believed himself to be in custody despite the officers' assurances to the contrary was not manifestly erroneous. Thus, *Miranda* warnings should have been issued and, because they were not, the subsequent taped confession was properly suppressed." *Id.*

¶ 55 The United States Supreme Court has made clear "the initial determination of custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned." *Stansbury*, 511 U.S. at 323. Our own supreme court has held we are to look at and weigh the factors discussed above, in paragraph 35, and "we then must make an objective determination as to whether, under the facts presented, 'a reasonable person, innocent of any crime' would have believed that he or she could terminate the encounter and was free to leave." *Slater*, 228 Ill. 2d at 150, 886 N.E.2d at 995 (quoting *Braggs*, 209 Ill. 2d at 506, 810 N.E.2d at 482).

¶ 56 However, as the State notes, this court has included the subjective test in the previously cited opinions. The language relied on by the State in *Gorman* and all of the cases relying on *Gorman* was unnecessary to the disposition of those cases and constitutes *obiter dictum*. Generally, *obiter dictum* is not binding as authority or precedent within the *stare decisis* rule. *People v. Grever*, 222 Ill. 2d 321, 336, 856 N.E.2d 378, 386 (2006). In *Gorman*, this court stated:

> "We begin our analysis by addressing a threshold issue that is implicit in defendants' motions to suppress their statements: Was there evidence before the trial court of a subjective belief on the part of the defendants that they were in custody during their interrogations? This threshold issue is not often acknowledged because defendants bringing motions to suppress typically testify, as did defendants in the present case, that they believed themselves to be in custody. *However, the case could arise where no such testimony is offered.* This issue may be clarified by asking the following: In deciding a motion to suppress, would the trial court have to examine the objective indicia of custody discussed in *Brown* had the defendant at the hearing on the motion testified that at all times he believed that he was *not* in custody and that he was free to leave the company of the police interrogators whenever he wished? See, *e.g.*, *People v. Urban* (1990), 196 Ill. App. 3d 310, 314, 553 N.E.2d 740, 742 (finding the State's contention that defendant was free to leave at any time unrebutted by defendant).
>
> Each of the three defendants in the present case testified that he believed he was in custody at the time he made the statements that are the subject of his motion to

- 13 -

suppress. Accordingly, the requirement of evidence on this threshold issue has been met, and we proceed with the rest of our analysis, beginning with a discussion of interrogations conducted in police stations." (Emphases added and in original.) *Gorman*, 207 Ill. App. 3d at 469, 565 N.E.2d at 1354.

As is clear from the above quote, any discussion regarding the impact of the defendant's subjective belief as to whether he was in custody was unnecessary in deciding *Gorman* and is only advisory.

¶ 57    Further, in *Goyer*, after devoting six paragraphs to this issue, this court noted:

"[I]n this case, *the State failed to argue this threshold issue before the trial court. Furthermore, neither party briefed this issue on appeal*. Accordingly, we decline to resolve defendant's claim on this basis." (Emphasis added.) *Goyer*, 265 Ill. App. 3d at 166, 638 N.E.2d at 394.

In *Griffin*, this time in an "Epilogue" that was not needed to decide the case, this court wrote:

"In many cases, this issue is not argued because a defendant typically testifies–*as did defendant in this case*–that she believed she was in custody. Regardless, we reaffirm our holding in *Goyer* that a defendant who seeks to suppress his statements on the ground that he was in custody during the police interrogation must first testify that he did in fact believe he was in custody during the interrogation." (Emphasis added.) *Griffin*, 385 Ill. App. 3d at 212, 898 N.E.2d at 712.

Finally, in *Wright*, this court again engaged in a discussion of this so-called "threshold" issue, acknowledging:

"As previously noted, defendant did not testify at the hearing on the motion to suppress that he believed he was in custody when Renken questioned him. However, *because the State failed to argue this threshold issue before the trial court and neither party has briefed this issue on appeal, we decline to address the trial court's denial of defendant's motion to suppress on this basis*." (Emphasis added.) *Wright*, 2011 IL App (4th) 100047, ¶ 37, 960 N.E.2d 56.

¶ 58    Other than the *Gorman-Goyer* line of cases, our research has failed to uncover any case finding it appropriate to look at the subjective beliefs of either the interrogator or the interrogated to determine whether an individual was in custody for *Miranda* purposes. Nor have the parties brought such a case to our attention.

¶ 59    As noted above, the United States Supreme Court has made clear the initial determination of custody depends on "the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned." *Stansbury*, 511 U.S. at 323. The legal theory found in the *dicta* of *Gorman*, *Goyer*, *Griffin*, and *Wright* contradicts both United States and Illinois Supreme Court precedent, and we decline to apply it.

¶ 60    We do note the reasoning found in the dicta in the *Gorman-Goyer* line of cases cited above has some instinctive appeal. However, if courts applied the subjective-belief threshold requirement discussed in the *Gorman-Goyer* line of cases, the individuals most in need of being advised of their rights–the uneducated, irrational, or those who simply lack common sense–would not require *Miranda* warnings even if they clearly were in custody for *Miranda* purposes. Although we mean no insult to defendant, the facts in this case clearly show why a subjective-threshold test should not be applied. We cannot excuse a failure to admonish a

defendant pursuant to *Miranda* based on the mere fact the defendant incorrectly believed he was not in custody for *Miranda* purposes.

¶ 61     Here, the trial court made factual determinations based in large part on undisputed evidence. Defendant's parole officer was looking for him because of anonymous tips indicating defendant was selling drugs. When the officers located defendant, they separated him from the other people in the house. Both parole agents were armed with firearms and defendant was required to cooperate with his parole officer. Once the lockbox with a large amount of cash was found, an officer handcuffed defendant. The cash was some evidence defendant may have been selling drugs, as the tip suggested. Handcuffing the defendant and then proceeding to question him about an independent crime objectively would have led a reasonable person to believe he was not free to leave or to terminate the encounter. Defendant was physically restrained and his freedom of movement was restricted. Under the totality of the circumstances, defendant was entitled to be informed of his rights under *Miranda* before he was questioned because he was in custody for *Miranda* purposes.

¶ 62                                III. CONCLUSION
¶ 63     For the reasons stated above, we affirm the trial court's suppression order.

¶ 64     Affirmed.

¶ 65     JUSTICE STEIGMANN, dissenting.
¶ 66     Twenty-four years ago, this court wrote about a hypothetical case in which a defendant made a motion to suppress his statements because they were the product of a custodial interrogation and he was not given the *Miranda* warnings, and yet "the defendant at the hearing on the motion testified that at all times he believed that he was *not* in custody and that he was free to leave the company of the police interrogators whenever he wished." (Emphasis in original.) *Gorman*, 207 Ill. App. 3d at 469, 565 N.E.2d at 1354. Three years later, this court again considered how it would resolve the same hypothetical case and wrote the following: "[I]f a defendant testifies that he believed he was *not* in custody but instead free to leave any time he wished during his questioning by the police, would the trial court need to consider what a reasonable person in that defendant's circumstances would believe? We think not ***." (Emphasis in original.) *Goyer*, 265 Ill. App. 3d at 165, 638 N.E.2d at 393.

¶ 67     The present case is the hypothetical case discussed in *Gorman* and *Goyer* come to life. Defendant moved to suppress his statements because he was not given the *Miranda* warnings before being questioned when–he claims–he was subjected to a custodial interrogation. However, at the hearing on defendant's motion, he testified (when asked by defense counsel) that he believed he could leave the interrogation, and he specifically told his counsel that he did not believe he was under arrest even when the officers put him in handcuffs, explaining his belief by testifying that he "hadn't done anything wrong."

¶ 68     The trial court initially denied defendant's motion, stating that the court was "clearly troubled by the testimony of the defendant that he did not feel at the time of the questioning that he was under arrest." Although the court ultimately granted defendant's motion to reconsider and later changed its ruling, defendant never recanted any of his earlier testimony.

¶ 69 The majority opinion does not dispute the trial court's finding that the defendant did not believe at the time of the questioning that he was under arrest–and, indeed, on this record, I do not see how it could–but instead it addresses that matter as follows: "Defendant's subjective belief he was free to leave was unreasonable and irrelevant to our determination. See *Stansbury v. California*, 511 U.S. 318, 323 (1994)." *Supra* ¶ 38. Because I believe that defendant's subjective belief that he was free to leave was not only relevant but dispositive in favor of the State, I respectfully dissent.

¶ 70 In *Goyer*, this court wrote that when a defendant makes a motion to suppress his statements on the ground that he was subjected to a custodial interrogation and not advised of his *Miranda* rights, before the trial court can conclude that the defendant was in custody, the court must first find that (1) the defendant subjectively believed he was in custody and (2) a reasonable person in defendant's position, innocent of any crime, would also believe himself to be in custody. *Goyer*, 265 Ill. App. 3d at 165, 638 N.E.2d at 393. This court then drew a comparison to the standard applied to a claim of self-defense, as follows:

> "We find analogous a defendant's burden in asserting self-defense in a murder case. Self-defense has two prongs: (1) the defendant's subjective belief that his killing was justified, and (2) the objective reasonableness of that belief. (Ill. Rev. Stat. 1991, ch. 38, par. 7-1.) If the defendant did not subjectively believe his actions were justified as self-defense, his claim at trial of self-defense must fail no matter how third parties might have viewed the circumstances confronting defendant at the time he killed the deceased. In other words, it is irrelevant under those circumstances whether the killing might have been done *objectively* in self-defense. Similarly, if a defendant's motion seeks to suppress his statements on the grounds that he was in custody during the police interview, yet the defendant himself testifies that he did *not* believe himself in custody, it is irrelevant whether a reasonable person similarly situated would agree." (Emphases in original.) *Id.* at 165, 638 N.E.2d at 394.

(I note that the above quote remains consistent with Illinois law. See *People v. Jeffries*, 164 Ill. 2d 104, 127-28, 646 N.E.2d 587, 598 (1995) ("In order to instruct the jury on self-defense, the defendant must establish *** (5) he actually and subjectively believed a danger existed which required the use of the force applied; and (6) his beliefs were objectively reasonable."); *People v. Lee*, 213 Ill. 2d 218, 225, 821 N.E.2d 307, 311 (2004) (reiterates the *Jeffries* standards regarding self-defense and adds that "[i]f the State negates any one of these elements, the defendant's claim of self-defense must fail").)

¶ 71 Criminal proceedings are individualized, with their focus being on not just what a defendant did, but often what he was thinking when he did it. Similarly, legal protections (such as the right to assert self-defense) and procedural protections (such as the right not to be subject to a custodial interrogation absent *Miranda* warnings) are also individualized. To demonstrate the individualized nature of self-defense, consider the following scenario:

> "An argument occurs between Smith and Jones in a tavern parking lot, and Smith takes out a gun and shoots Jones three times, killing him. Several witnesses testify to having seen this action, and each adds that during the argument, they saw Jones suddenly reach into his belt and quickly withdraw some shiny object in his hand that each witness at first thought was a gun. In fact, that object turned out to be a chrome-colored cell phone. Assume that Smith's defense counsel, planning all along to assert that Smith shot Jones in self-defense, calls Smith to testify about what happened

during the shooting. However, Smith surprises his attorney (and probably everyone else in the courtroom) by testifying as follows: 'Yeah, I saw Jones reach into his belt as if he were reaching for a gun, but I knew he didn't have a gun, and I never feared that he was going to shoot me. Jones never carried a gun, and I was never afraid of him. I didn't shoot Jones because I feared him, but because I got sick of his big mouth and the fact that he was now running around with my old lady.' "

¶ 72    Even if the trial court might have been inclined to instruct the jury on self-defense absent this testimony (I know I would be), can a self-defense instruction still be given in the teeth of the defendant's denial that he was acting in self-defense or believed that he was in danger? Clearly not, because of the *individualized* nature of self-defense, as explained by the Illinois Supreme Court in *Jeffries* and *Lee*.

¶ 73    I concede that there is no case law explaining this point regarding custodial interrogation as there is regarding self-defense, but that is because defendants in cases like the present one almost always testify that they, in fact, believed they were under arrest or otherwise not free to go when they were interrogated. As far as I can tell, with the exception of the *Gorman-Goyer* line of cases, courts of review have never directly commented upon the need for a defendant to affirmatively state that he believed he was in custody as a threshold requirement for his claim that his statements should be suppressed because they were given absent the *Miranda* warnings. (Certainly, I am aware of no case like this, in which a defendant seeking to suppress statements he made to the police in the absence of the *Miranda* warnings explicitly eschews the notion that he was in custody.) Instead, courts typically go directly to the question of the reasonableness of such a belief by asking whether a reasonable person in the defendant's position would have understood himself to be subjected to the restraints comparable to those associated with a formal arrest. See *supra* ¶ 47. But, regarding a claim of custodial interrogation, as in the case of the hypothetical involving Smith's shooting Jones in the tavern parking lot, it makes no difference that an objective, reasonable observer of Jones' behavior might have believed himself to be in danger of Jones' pulling a gun and shooting him *if the defendant standing trial did not*.

¶ 74    As earlier stated, there is not much precedent from higher courts regarding the *Gorman-Goyer* line of cases, but there is at least one Illinois Supreme Court decision that seems to support that line. In *People v. Garcia*, 165 Ill. 2d 409, 651 N.E.2d 100 (1995), one of the issues was whether the suspect was subjected to a custodial interrogation, requiring the giving of *Miranda* warnings. The supreme court analyzed the issue before it as follows:

> "Initially, it should be noted that defendant's statements during her first visit to the Bensenville police station around 8:15 a.m. on July 23, 1991, are not subject to her *Miranda* claims because, as the defendant herself stated at trial, she came to the station voluntarily and understood that she was free to leave at any time, which she did several hours later. Likewise, her written and oral statements at 6 p.m. on July 23, 1991, fingering Gonzalez for her husband's murder were not subject to *Miranda* warnings because, as defendant testified, she understood she was not under arrest at the time of this statement and was free to leave. Thus, no basis exists for arguing that any of the statements by defendant during these time periods can be suppressed because defendant was not in custody when they were made." *Id.* at 422, 651 N.E.2d at 106-07.

¶ 75    What is significant about the above analysis is that the supreme court never mentioned the need to apply an *objective* standard to the suspect's situation, concluding instead that, *given the*

*defendant's testimony*, she understood she was not under arrest. Apparently, that conclusion by the supreme court was dispositive. The supreme court concluded *no basis exists* for arguing that those statements could be suppressed, apparently not concerning itself with the objective standard of how a reasonable person other than the defendant might have viewed her situation.